MILLIE HAWTHORNE, Appellee, v. FREDERIC A. DELANO et al., Appellants.

**EVIDENCE: Theory—When Established—Other Reasonable Hy-**
1  **pothesis.** A theory cannot be said to be established when the record is just as consistent with the nonexistence of the truth of the theory as with its existence. So held in a controversy as to the manner in which deceased met his death.

**DEAD BODIES: Intentional Indignity to Body—Essentials of Action.**
2  An *intentional* wrong or indignity is an all-essential element of an action for damages for the mutilation of a body after death. (Sec. 4945, Code, 1897.) *Held,* such element not appearing, action would not lie.

*Appeal from Superior Court of Shenandoah.*—HON. GEORGE H. CASTLE, Judge.

FRIDAY, APRIL 9, 1915.

REHEARING DENIED TUESDAY, OCTOBER 5, 1915.

ACTION for damages for the mutilation of the dead body of plaintiff's son and for indecent exposure of the same. There was a verdict for the plaintiff and the defendants appeal.—*Reversed.*

*Earl R. Ferguson* and *C. R. Barnes,* for appellee.

*J. L. Minnis, N. S. Brown,* and *Jennings & Mattox,* for appellants.

EVANS, J.—I. Some time on the night of August 11, 1913, Charles Hawthorne was killed upon the railway track of the defendant company. His body was discovered in the morning greatly mangled and between the rails of the track. This is not an action for damages for the wrongful death of the decedent. For such alleged damages, the plaintiff has recovered in another action. This action is brought on behalf of each parent (1) for damages for mental suffering caused by the mutilation of the body, and (2) for indecent exposure of the dead body in violation of Sec. 4945 of the Code. The father assigned his alleged causes of action to the plaintiff. This action is brought in four counts, in two of which the plaintiff sues as assignee of her husband.

Late in the evening of August 11th, the decedent had been put off of the defendant's train as a trespasser between the stations of White Cloud and Strahan, stations between Council Bluffs and Shenandoah. This train was a passenger train traveling east and was known as No. 14. The decedent had ridden upon it as a trespasser from Council Bluffs to this point. He had been put off several times, but had succeeded each time in boarding the train again in some form. At one time he rode on top of a coach; at another time he rode underneath a coach. At and near White Cloud, the train stopped three times in succession in order that he might be put off. The train was a vestibuled train, consisting of a rear sleeper, a coach, and a combination mail car and smoker. The last time the decedent was put off the train, he was driven off the right of way by the porter and into the adjoining field. The train then started up; the porter ran alongside of it for a time and then jumped aboard. Thereupon, the decedent also undertook to catch and board the train. According to the testimony of the trainmen, he failed to catch it and was thereby left in the distance. This action is predicated upon the claim that the decedent did catch the train and did board the same and that he was pushed off by the trainmen so that he fell to the ground and was thereby killed; that the train-

men, knowing of his death, failed to report it, and permitted the body to lie upon the track, whereby many trains passed over it during the night and caused the mutilation complained of.

On the proposition that the decedent was killed by being pushed off train No. 14, the plaintiff introduced the testimony of three witnesses, Otis McCrary, H. E. Harris, and Earl Polk, the latter being a companion of the decedent, and all being passengers upon this train. McCrary testified as follows:

"I was in the smoker the last I saw him on the right-hand side of the train going east. My window was open. We were watching out of the window. Yes, that was being done by a great many passengers. I last saw Charlie Hawthorne in the cornfield. He went over there, the porter was after him. The cornfield was on the west side of the right of way. Yes, there was a barb wire fence there, Charlie Hawthorne went through it. Yes, after he got through the fence he started to run along in the cornfield the same direction the train. Yes, the train entered a cut there which hid Charlie from me. That is the last I saw of him. Yes, I think there is a grade from White Cloud to Strahan. It was getting dark and I pulled my head in."

Cross-examination:

". . . Yes, sir; it was then that he was run clear out of the right of way and over the fence and he was running along eastward same way as the train and finally obscured him from my view by the cut. . . . He finally got back on or under while they were standing at the water tank. That was about the time I heard this conversation between him and the officers of the train. Yes, sir; and then they pulled up and he got on again and they stopped as they were pulling out east of White Cloud. I could not say how far it was from White Cloud when he run out into the cornfield, it was getting late. This conversation I heard was the

first of the three stops.  Yes, sir; that would be down at the crossing.  Well, I couldn't say whether that was before they got to the water tank. . . .  I couldn't say whether he tried to swing under the train.  I guess he did.  I couldn't say whether it was the last time or not.  Yes, sir; he had swung under the car, they stopped the train and put him off.  Couldn't say whether it was the last time they stopped.  They first stopped for the Sidney branch crossing.  That is where I mistrusted trouble and seen it was Charlie Hawthorne and wanted to pay his fare.  He was put off there.  When he was put off the last I seen of him he was in the cornfield.  He got on two or three times and each time they put him off, first time he caught under the sleeper or the day coach.  The last time he caught clear at the rear end of the train.  Yes, sir; they stopped then and put him off, I think that was the time they run him in the cornfield.''

Harris testified:

''They were putting him off, the trainmen were.  The train then started up. .I don't think they made a stop after they put him off that time.  That was when they put him off in the cornfield.  I couldn't say how many times they stopped as they left White Cloud, they stopped three times that night.  Yes, sir; I may be wrong about it as to their having a conversation up there where they put him off in the cornfield.  The last time I saw this boy he was over in the cornfield.  I never saw him going to the cornfield.  I saw him in the cornfield.  It was some little distance from White Cloud.  I saw the train porter push him out of the right of way over the fence.  The porter came back to the train and Charlie ran down in the cornfield.  Yes, sir; the train moved into a cut.  I don't know anything about a heavy grade.''

Polk testified:

''. . . When Charlie Hawthorne left the train the last time he ran over in the cornfield.  The porter chased him.

Ran him clear through the fence into the cornfield. The porter followed him along a ways and then got on the train. Hawthorne ran parallel inside the cornfield same way as the train, about to the cut, then he slid down the bank there and caught the back end of the sleeper. Well, he had a hold of the train and somebody in blue uniform was trying to push him off and I was watching. He fell off. Yes, I was looking out of the window. Near the middle of the chair car. The weather was pretty warm that day, my window was up. I was leaning out as far as I dared without falling. I never have seen him since they pushed him off and he fell. Yes, it was in the cut somewhere between that mark 'E. P.' and the station of Strahan, about ½ mile west of Strahan. . . .''

Cross-examination:

''The last time they put him off was at the rear steps of the sleeping car, I think. Yes, sir; it was light enough for me to see from the center of the chair car back to the rear steps of the sleeper. No, sir; the trainmen did not have their lanterns lighted at that time. The train was going reasonably slow when they put him off, a big grade there and a light engine puffing. When they pushed him off he lit about the middle of the rails; they just pushed him off and that was the last I saw of him. Q. But the steps are on the side of the train, and he was there in the middle of the rails? A. Yes, sir; the middle of the rails would be around the rear end of the sleeper after the train went by. He would have to lie on the ground at the side of the rails if he was pushed off at the steps. I just seen him pushed off and he fell. He might, part of him, been on the rails. With regards to the south rail the train was going east, he was on the right-hand side. Yes, sir; right-hand side would be the south side and outside the side of the car; yes, sir. I couldn't say how far beyond the south side of the car he fell. He did not get up, I see. I saw him pushed off. I couldn't say more than reasonably sure

where his body was at the instant I last saw him. He was pushed off and that was the last I saw of him. I should judge he was partly on the rail and partly on the ground and partly on the rail. Well, the south side of the car would be about 2 feet over the south rail, beyond the rail 2 or 2½ feet. I think he was pushed off and pushed part way over the rail. No, I couldn't see the rail but I should judge that was where he lit. I seen him when they pushed him off; he had ahold of the end rail when he was standing there, he was facing north. Yes, sir; trying to get up. I think it was his left hand ahold of the rear handhold. Well, when they pushed him off his face would be partly east, his face was downward.''

The reliance of the plaintiff is upon the testimony of Polk. The testimony of this witness presents some manifest inconsistencies with itself. Disregarding these, we think the most that can be claimed for it is that it shows that the decedent caught hold of the rear rail with his left hand and was ''trying to get up'' and that the trainmen present prevented him and released his hold. The conductor testified that he was on the rear steps for the very purpose of preventing the boarding of the train by the decedent and that the decedent did not catch the train at all. Polk testified that the train was going ''reasonably slow.'' Of course the decedent could not have otherwise caught it.

The question at this point is whether the foregoing is sufficient evidence to prove that the decedent was killed by train No. 14 in the manner herein indicated and that the trainmen knew it. The question is not now whether the company was legally responsible for the death, even though caused by other trains. Plaintiff concedes that, in so far as the company was responsible for the death, it would not be liable to a second action for the mutilation, in so far as the mutilation was part of the original accident. In other words, a cause of action for alleged mutilation could arise only after the death of the decedent and because of mutilation of the

dead body. If the decedent was killed by train No. 14 in the manner claimed, then it may be conceded that it would have been the duty of the trainmen knowing such fact to report the same and to protect the body against mutilation or other indignity. The argument for the plaintiff is that the circumstances shown were sufficient to warrant the jury in finding that the decedent was thus killed and that the trainmen must have known it, notwithstanding that the witness Polk did not think so at the time. Many trains passed over the track during the night and the mutilation of the body was undoubtedly caused by some of these, but it is not claimed that any of the employees in charge of such trains knew of the presence of the dead body. Knowledge is charged against the employees of train No. 14 alone and this knowledge is claimed to be imputable to the corporation, regardless of the innocence of the employees who caused the trains to run over the body.

Taking the case as plaintiff makes it, upon the theory upon which she presents it, we think the evidence was not sufficient to show that the decedent was killed at the time and in the manner stated. All that can be said is that such might have been the case, but this is a mere hypothesis. Other hypotheses could be advanced to account for his death, quite as plausible and quite as consistent with the testimony. The circumstances proved are not such as can be said to exclude every other reasonable hypothesis. We might raise the question whether, if the decedent was at that time seriously hurt, and if, because of his injuries and helplessness arising therefrom, he was later killed by another train—whether such a state of facts could be found from the evidence, and if found, whether it could save the plaintiff's case. But the action is not predicated upon this theory, and for the manifest reason that such a state of facts would not bring notice of the dead body to the employees either of train No. 14 or of the train, if any, which caused the death. The plaintiff therefore has

1. EVIDENCE: theory: when established: other reasonable hypothesis.

planted herself upon the proposition that the decedent was killed by train No. 14. After a careful reading of the entire record, we are united in the opinion that the evidence is not sufficient to sustain such a finding of fact. This being so, this branch of the case must fail because no one knowingly passed a train over this dead body. On the abstract question, therefore, of the right to recover damages in such cases and on the question of whether the right of action arises to the father or to the mother or to both, we need not enter.

II. Two counts of the petition are based upon the alleged breach of the criminal statute, Code Sec. 4945, which is as follows:

2. DEAD BODIES: intentional indignity to body: essentials of action.

"If any person wilfully and unnecessarily, and in an improper manner, indecently expose, throw away or abandon any human body, or the remains thereof, in any public place, or in any river, stream, pond or other place, he shall be imprisoned in the penitentiary not more than two years, or be fined not exceeding $2,500, or both."

The dead body was actually discovered at about 7:00 o'clock on the morning of August 12th. On this question, the plaintiff introduced the following evidence. Penney testified:

"Am section boss for the defendants at White Cloud and was there during August last. Yes, sir; I attended the inquest of Charlie Hawthorne's remains at Malvern. I talked with the officers of train second No. 91 westbound freight. Some of them said a dead hog was on the track or by the track up the hill. I went up and I left the house about 7:30 in the morning of the 12th. Went up to where this boy was found. A long switch at Strahan, it was about 1,000 feet west of the switch where he was found. There was a heavy embankment on the south side. I didn't find him, John, a colored man, the extra gang foreman, found him. When I got there the boy was lying outside the track. Had been

removed outside by a man of No. 1 going west. I imme-
diately notified the company and the coroner. The body was
taken from there to Malvern about 11 o'clock. We took it
on a handcar.''

Cross-examination:

''I went up there because I was called by the telephone.
This nigger foreman called me. No, sir; I didn't have any
knowledge of any dead body being there before that. I noti-
fied the agent at Malvern to notify the company and the
coroner. As quick as I could walk to Strahan, perhaps 3,000
feet, I got into communication with the agent to notify the
coroner. Yes, sir; the body was lying outside the rails and
free from interference by trains. I only covered the body
up when I got there, with a white sheet. Got the sheet at the
store at Strahan. The coroner gave me instructions to take
the body to Malvern and I took it there in obedience to his
request. The coroner got there five minutes after I did, at
the depot in Malvern and after he got there the undertaker
took the body.''

Warden (not an employee of defendant railway) testi-
fied:

''One of those extra gang niggers discovered the body
first and came up to Mr. Ralston just as we were starting to
work and then Lon, Carl and I went out there. The body
when I first saw it was lying between the rails. The top of
his head was cut off and his legs was mangled up. Arms
were broken and one hand was cut. The head was facing
south. He was lying on the side of his head, one side of his
face downward. The ballast there was rocks and cinders. Yes,
sir; his face was scratched up and bloody. That was about
7:00 o'clock and then I went back to my work leaving it still
between the rails. Yes, sir; and then Mr. Penney came down
and I went back with him to identify the body. The tailor

had his name in his coat pocket. When I first seen him I knew it was somebody I knew, but I had to study a long time before I could study out who it was. Well, the body was removed when No. 1 came along, it must have been late for it was somewhere between 8 and 9 o'clock when the train came. When No. 1 came up there the conductor ordered those negroes to remove the body from the track and lay it off to one side. I was there. . . ."

Cross-examination:

"The first time I went out there was about 7 o'clock. Mr. Penney was not there. The extra gang was there and I and Dalyrimple and Polsom; and the body was between the rails. Yes, sir; I left it there and went back to Strahan. Why, I left it there because I had no right to bother it, I would not have took it out of there for anything. I would not have done it. . . . Yes, sir; I left the body as I saw it and went back to Strahan. Yes, sir; and then Mr. Penney came to Strahan, that is where I first saw him and I went back to the body with Mr. Penney. It wasn't long after that before No. 1 came along. They sent a fellow back to flag the train. Yes, I was there when No. 1 arrived. Yes, it stopped before it got to the body. Yes, sir; the conductor and brakeman came up to the body from No. 1. Why, the conductor told those fellows to move the body off the track and they did so. No, sir; I wasn't there when Mr. Penney covered the body with a sheet. After the body was moved from between the rails to the side of the track I then went back to my work. . . . I don't think Mr. Penney went back with me when I went back to work the last time. He told me to telephone and I telephoned up there. I telephoned to Mr. Hawthorne, the boy's father. Yes, sir; I telephoned to the agent at Malvern. I told him to send a message. Penney told me what to tell him and I told him. I don't remember just what Penney told me to tell him. He told me to telephone and find out

what to do with the body. I don't remember whether he said to notify the coroner. The agent in response to my message told me as near as I can remember to take the handcar and bring the body and all belonging to Malvern. Yes, I sent the message out to Penney, didn't take it myself. Took it to the depot and the agent took it out.''

Redirect examination:

''Yes, sir; I was there when No. 1 passed. No, sir, the body was not taken on No. 1 to Malvern, but was left at the side of the rails.''

Can it be said that the foregoing testimony discloses any wilful act or any intentional indignity to the dead body? It seems to us to prove the very contrary. That the first discoverers of the body should have deemed it their first duty to report it to their superiors and should have believed that they had no right to interfere with the body is not at all incredible. Circumstances often arise wherein such course would be very expedient. The idea which controlled these people in their first hesitancy was in accord with a prevalent popular belief and was indicative of reverence rather than of indignity. The body was guarded where it was and no train was allowed to pass over it after it was known that it was the body of a human being. Nothing that could have been done could have relieved the situation of the gruesome conditions. It is urged for the plaintiff that the belief of these parties as to the necessity of sending for the coroner is no defense. Some reliance is placed at this point upon the case of *Kyles v. Railway Co.*, 147 N. C. 394. In that case, the body had been permitted to lie between the rails, and trains had been run over it for many hours after the discovery that it was a human body. The action was for damages for the mutilation thus perpetrated. It is clear enough that the excuse of waiting for a coroner would not justify the running of trains over the body and its further mutila-

tion.  Such is not the question involved at this point.  Our statute under consideration now has to do with wilful and intentional acts.  The acts therein proscribed are inconsistent with good faith and good intentions.  Unless some of the employees were guilty of violating this statute, then the defendant was not.  We think there was a failure of proof of any violation of this statute, in that no intentional wrong or indignity was shown.

In considering this case, we have avoided the question of whether the defendant company can be held liable for the death of the decedent, because such question is before us in the companion case before referred to.

We only hold now that, regardless of the question of whether, upon any view of the evidence, the defendant might be held liable for the alleged wrongful killing of the decedent by means of some train, no separate liability is disclosed as for the mutilation of the dead body or as for a violation of Section 4945 of the Code.

The trial court should have directed a verdict for the defendant.  The judgment below is therefore—*Reversed.*

DEEMER, C. J., PRESTON and SALINGER, JJ., concur.