YAGGLE v. ALLEN et al.

(Supreme Court, Appellate Division, Third Department. January 5, 1898.)

1. PHYSICIANS—ACTION FOR MALPRACTICE—EVIDENCE.

In an action against two physicians for causing the death of deceased by negligently administering chloroform, resulting in suffocation, while under their care, a judgment for plaintiff will be reversed, where there was a direct conflict of testimony between the defendants and deceased's son, who was the only other person present at the operation, as to the amount of chloroform used, and the manner in which it was administered, and the only physician sworn for plaintiff testified, upon a hypothetical question summarizing deceased's son's testimony, that he was unable therefrom to state the cause of death, while one physician, sworn for defendant, testified, after the result of the autopsy had been read, that he was unable to state the cause of death, and other two testified that death was caused by heart trouble.

2. EVIDENCE—WEIGHT AND SUFFICIENCY.

When there are two or more possible causes of an injury, for one or more of which defendant is not liable, and the evidence in the case leaves it just as probable that the injury was the result of one cause as the other, the plaintiff cannot recover.

Appeal from trial term, Albany county.

Action by Rosie Yaggle, as administratrix of the estate of Frederick Yaggle, deceased, against Charles S. Allen and another, for damages for negligently causing the death of plaintiff's intestate. From a judgment for plaintiff, defendants appeal. Reversed.

The defendants and appellants are father and son, physicians and surgeons, residing and practicing their profession in the city of Rensselaer. On or about the 23d of January, 1896, the plaintiff's intestate, Frederick Yaggle, having a dislocated shoulder, called at the office of defendants to have his shoulder set. His shoulder was subject to dislocation, and in the preceding ten years it had been dislocated, and reset by the defendants, upon at least eight different occasions, and upon some or all of these occasions the defendants, before performing the operation, had placed him under the influence of chloroform; the last occasion prior to the one in question being in August of the preceding year. Upon the occasion now under consideration, Yaggle was placed in the operating chair, chloroform was administered to him, and the dislocated shoulder put in place. After this operation had been performed, and while still under the influence of the chloroform, or while recovering from its influence, or just after recovering from its influence, there is a conflict in the evidence as to which, but while still in the operating chair, Yaggle suddenly expired. The plaintiff, being appointed administratrix of his estate, commenced this action against the defendants for negligence and unskillfulness in performing said operation, and upon the trial recovered judgment against them for $2,500, together with the costs and disbursements of the action.

Argued before PARKER, P. J., and LANDON, HERRICK, PUTNAM, and MERWIN, JJ.

Burlingame & Le Boeuf (Randall J. Le Boeuf, of counsel), for appellants.

Francis B. Delehanty, for respondent.

HERRICK, J. There were only three persons present at the time of the administration of the chloroform to, and the performance of the operation upon, the deceased,—Sebastian Yaggle, his son, and the two defendants. Sebastian and the defendants are in direct conflict in regard to the amount of chloroform used, the manner of its administration, and several other details, which are relied upon by the respondent as evidence of the negligent and unskillful manner in which the defendants conducted the operation. In the view that has been taken of the case by this court, it is unnecessary to go into a detailed discussion of the evidence given upon the trial, or of the various minor particulars which are pressed upon us by the respondent's counsel, as evidence of the unskillful and negligent manner in which the defendants discharged their duty towards the deceased. The principal points relied upon, and wherein the evidence of Sebastian Yaggle and the defendants come into direct conflict, are as to the amount of chloroform used, and the manner in which it was administered,—it being claimed that the amount used, and the manner in which it was used, caused the suffocation of the deceased; the other details of carelessness and negligence alleged being that there

was not sufficient preparation by the defendants made, nor watchfulness over the deceased, to prevent suffocation, or to promptly relieve him from it. The main question resolves itself into this: Did the deceased die from suffocation, produced by the use of an undue quantity or excessive dose of chloroform, or from its improper administration?

After the evidence of Sebastian Yaggle, which was the only evidence for the plaintiff in regard to the quantity of chloroform used, or the manner of its use, as well as the other details of the operation, and before any of the evidence of the defendants was given, or the results of the autopsy, Dr. Stonehouse was examined as a witness on behalf of the plaintiff. He was the only physician placed upon the stand by the plaintiff to testify as to the cause of death of plaintiff's intestate. A hypothetical question was put to him by the plaintiff's attorney, which summarized the evidence of Sebastian as to the amount of chloroform used, the manner in which it was administered, the apparent condition of the deceased, together with the assumed fact that he became and remained unconscious to the time of his death. To that question the witness gave the following answer:

"Knowing nothing more about the case than what you stated, I should say he died during chloroform anæsthesia. That is all I can say. I can't say what was the cause of death. Q. I assume these were the facts? A. With nothing more than that, I can't give the cause of death. Q. I ask you what, in your judgment, was the cause of death? A. I can't say."

A few hours after the death of Yaggle a post mortem examination was held, and one of the attending physicians upon such examination was called as a witness by the defendants, and from the notes of the autopsy taken and signed at that time, such physician being asked to state what was found, the witness answered:

"I can state the pathological conditions I found there. I found a congestion in the lower portion of each lung; organized blood clot in the right auricle of the heart; some calcareous deposits around and in the aortic valves. These calcareous degenerations extended up this artery for a short distance, perhaps an inch or inch and a half, and extending over one-half the circumference of the artery, and the liver was congested; kidneys were congested; and, as we thought, there was some fatty degeneration."

As the result of such autopsy, this physician gave it as his opinion that the deceased died from calcareous degeneration of the heart. Subsequently, however, this witness testified that the shock and pain resulting from a dislocation of the shoulder, in conjunction with the calcareous diseased condition of the heart, might be sufficient to produce death; and also that, while at the time of the autopsy they thought he died of calcareous degeneration of the heart, he then could not swear positively that he did; and in answer to a question as to whether, in his opinion, he died from that cause, said:

"I do not think he did. I think this condition of the heart might have had something to do with his death, but there was something beyond it. I think, as I said before, it might be due to shock. But, as I understand a post mortem examination, to find the cause of death, the operator is supposed to find just what actually exists there at that time. What I mean by that, I didn't know anything about other conditions,—the man's habits, or the disease he had before. Q. Did you reach a result in your mind as to the cause of death at that time? A. I said I did. Q. What was that? A. Calcareous degenera-

tion of the heart.   Q. That was your judgment?   A. Yes.   Q. You don't de-
sire to change your testimony that you think there 'was something beyond that
to cause the death?   A. I think now that there was.   I say that is a predis-
posing cause.   Q. That might have been an overdose of chloroform?   A. Yes.
Q. That would have been just as good a cause as shock?   A. Yes; might have
been chloroform and might have been dynamite."

The witness stated, in reference to the condition in which they
found the heart of the deceased:

"It seems to me that a shock or any condition that would retard the action
of his heart might produce sudden death.   Q. Asphyxia would cause it?   A.
Might.   Q. In other words, you mean, other things supervening, this would
facilitate death or contribute to it?   A. Yes.   Q. There was no reason why
that alone—that condition of the heart—should cause sudden death?   A. No;
there isn't."

Dr. Ferguson, who was sworn for the defendants after the result of
the autopsy had been given in evidence, was unable to state the
cause of death.   Dr. Hailes testified that the condition in which the
lungs of the deceased were found upon the post mortem examination
was evidence that he did not die from suffocation or congestion, and
that in his opinion the death did not result from the use of chloro-
form, and gave it as his opinion that he died of disease of the heart.
Dr. Vander Veer gave it as his opinion that the evidence as to the
condition of the lungs of the deceased furnished no evidence that
the patient died from strangulation; that the lungs would be more
generally filled and congested; that the congestion would be more
uniform throughout the entire lung.   He gave it as his opinion that
the deceased died from fatty change or degeneration of the vessels of
the heart.   There seems to have been no difference of opinion among
the physicians but that, if the deceased had died from suffocation or
strangulation, the lungs would have been generally congested, not to
the slight degree which the post mortem showed them to have been.

Without further discussion of the testimony, it is sufficient, as to
this phase of the case, to call attention to the fact that the only phy-
sician sworn on behalf of the plaintiff testified, from the plaintiff's
own evidence as to what took place, that he is unable to state the
cause of death; that one of the physicians sworn for the defendants
states that he is unable to give the cause of death; that two others
state that, from the condition in which the lungs were found, death
was not the result of suffocation or strangulation, but, in their opin-
ion, was produced by calcareous degeneration or fatty change of the
vessels of the heart.   When this is the condition of the evidence of
the physicians, how could a jury reach any determination as to the
cause of death?   If the very able doctor called by the plaintiff, with
only the evidence of Sebastian as to what took place, and without the
opposing evidence of the defendants, and of the developments of the
post mortem, to embarrass or aid him, was unable to state the cause
of death, how could the jury determine it?

This is not a case of conflicting expert testimony, where upon one
side the doctors swear that the death was caused by suffocation pro-
duced by the use of chloroform, and on the other side the doctors
swear that the death was caused by calcareous degeneration of the
heart, and where possibly it would be left to the jury to determine,

from the manner in which they gave their evidence, and from the reasons upon which they based their opinions, as to who was correct; but it is a case where some of the doctors cannot tell what was the cause of death, and others that it was not caused by the use of chloroform, but was caused by this calcareous degeneration of the heart.

Considering the evidence of these physicians in the view that is most favorable to the plaintiff, the most that can be said is that it is doubtful what caused the death of the deceased. We may even go a little further, and say that this death was caused either by the use of chloroform or from calcareous degeneration of the heart. We may guess or surmise as to which it was, but neither juries nor courts are permitted to render verdicts or judgments upon guesses or surmises. Under the evidence in this case, the familiar rule is applicable that:

"Where there are two or more possible causes of an injury, for one or more of which the defendant is not responsible, the plaintiff, in order to recover, must show by evidence that the injury was wholly or partly the result of that cause which would render the defendant liable. If the evidence in the case leaves it just as probable that the injury was the result of one cause as the other, the plaintiff cannot recover." Grant v. Railroad Co., 133 N. Y. 657, 31 N. E. 220; Hanrahan v. Railroad Co., 17 App. Div. 588–592, 45 N. Y. Supp. 474.

The judgment and order should therefore be reversed, and a new trial granted, with costs to abide the event. All concur.