CAMILLA RAMBERG, Administratrix, Appellee, v. EARL E. MORGAN, Appellant.

No. 38826.

MARCH 13, 1928.

REHEARING DENIED DECEMBER 13, 1929.

*Snyder, Gleysteen, Purdy & Harper* and *C. M. Dutcher*, for appellant.

*Robert B. Pike* and *Larned F. Brown*, for appellee.

DE GRAFF, J.—This action was commenced to recover damages for alleged malpractice by a physician. Upon the conclusion of all of the evidence, the appellant moved for a verdict in his favor. The motion, which was overruled, is in the nature of a demurrer to the evidence, and in reviewing the denial, we must accord the testimony verity and give it probative value within the limitation of every reasonable inference the jury could draw therefrom.

Plaintiff's case rested upon the charge of negligence on the part of the defendant in the diagnosis, treatment, and care given the plaintiff's intestate when professionally called to attend said intestate after the occurrence of an automobile accident.

The overruling of the defendant's motion for a directed verdict is the primary error assigned. The grounds of the motion are: (1) That there is not sufficient evidence in the record to justify the jury in returning a verdict against the defendant, and if the jury returned a verdict for the plaintiff, it would be the duty of the court to set aside the verdict, as not supported by the evidence; (2) that, even though there were sufficient evidence in the record to show the negligence and unskillfulness of the defendant, there is no evidence in the record that would

justify the jury in finding that, but for the wrongful acts of the defendant, as alleged, the decedent, Carl Ramberg, would have lived, for the further reason that the uncontradicted evidence shows that this man was suffering from a severe brain injury, which was in itself an injury which might have caused death in the face of the exercise of the highest degree of skill and care on the part of the defendant, and to allow the jury to find, in the face of that fact, that his death was not due to the injury, but to the wrongful acts of the defendant, would be permitting the jury to speculate and conjecture, and to make a mere guess; (3) that there is not sufficient evidence to justify the jury in finding that any wrongful act on the part of the defendant was the proximate cause of the death of Carl Ramberg, or was the proximate cause of any damages to the estate of Carl Ramberg; (4) that, under the evidence in this record, it is just as probable that the man died from the original injury, and that that was the proximate cause of his death, as that he died or that his death was accelerated as the proximate result of any wrongful acts of the defendant's; (5) that the most favorable view to the plaintiff, on the state of the record, is that there are two or more causes which might have produced death, for one of which only the defendant would be responsible, and no basis for the jury, as laymen, under the expert evidence that is introduced in this case, to be reasonably convinced that the wrongful acts of the defendant were the proximate cause of the death; (6) that, under the evidence, there is no basis for a jury to assess any damages to the estate of the deceased on any theory that the acts of the defendant accelerated the death of the plaintiff's intestate, and no evidence from which a jury could find that any period of acceleration due to the acts of the defendant was a period during which the deceased, if his death had not been accelerated, would have added anything to his estate; (7) that, upon the whole record, a jury, to reach a verdict against the defendant, would be required to guess, speculate, and conjecture upon a subject of skill and training and of science concerning which the jury, as laymen, know nothing.

It therefore appears that the case presents two issues: (1) The negligence of the defendant, and (2) the proximate cause of death. True, these issues are correlated, but a failure on the

part of the plaintiff to prove either is fatal to his pleaded recovery.

We may state the respective contentions of appellant and appellee as follows: The contention of appellant is that the conditions directly causing the death were the natural and probable result of the injury received by plaintiff's intestate when hit by an automobile, and therefore nothing that was done or omitted to be done by the defendant could or did effect the ultimate death. The contention of the appellee is that the conditions directly causing the death were not the probable result of the injury alone, but that such conditions developed following the injury, because of the way the injured man was treated, and because the injury did not receive proper treatment, and therefore the lack of proper treatment was the efficient and proximate cause of the disorders or injury due to the blow's becoming so injurious as to result in death. The problem, in reality, is one of causation. The question is whether the traumatic injury would naturally and probably, in the regular course of events, have produced the conditions resulting in death, or whether the deprivation of ordinary treatment, in conjunction with improper treatment, materially contributed to produce the condition that resulted in death.

It is clear that appellee cannot successfully contend that the lack of treatment or improper treatment was the sole cause of death. This cannot be true. The condition of plaintiff's intestate, due to the injury he received, was necessarily a contributing factor or condition upon which the subsequent intervening acts, if any, operated. The defendant did not cause the accident resulting in injury to plaintiff's intestate. It is apparent, therefore, that the alleged negligence of the defendant is the first issue in this case. Do the facts in this particular present a jury question? We answer in the affirmative.

The law is well settled that a patient who is treated by a physician is entitled to a thorough and careful examination, such as the condition of the patient and attending circumstances will permit, with such diligence and methods of diagnosis for discovering the nature of the ailment as are usually approved and practiced by medical men of ordinary or average learning, judgment, and skill in that community or similar localities. An attending physician does not insure either correct diagnosis or

correct treatment, but is required to possess the skill and learning which is possessed by the average member of his profession in good standing in that or similar localities, and to apply that skill and learning with reasonable care. See *Nelson v. Sandell,* 202 Iowa 109.

If, by the exercise of such care and skill, the specific injury would have been discovered, a failure to properly diagnose is negligence, and it is the duty of a physician, in taking charge of a case, to follow the case, and to give proper instructions to the patient as to his future acts and conduct.

It cannot be disputed that the correct treatment and probable results are scientific questions, and alleged malpractice in any case must be substantiated by the testimony of expert witnesses. It is the province of experts, physicians and surgeons, to say whether the treatment and acts of an attending physician in any case were or were not proper.

It is unquestioned in the instant case that the defendant did not prescribe any treatment to his patient, believing, as he did, that the patient was intoxicated, although he had been advised that the patient had received a very severe traumatic injury by being struck by an automobile, and with sufficient force to render him unconscious. He was unconscious at the time defendant visited him, which was about an hour after the accident. In a sense, this is not a case of proper treatment, but of no treatment at all. The complaint relates to an act of omission, rather than of commission.

What are the primary facts bearing on the first issue? The appellant, Morgan, is a physician and surgeon, practicing his profession in the city of Sioux City, Iowa. On Wednesday, January 20, 1926, he was assistant police surgeon in said city. Between 11 and 11:10 P. M. on said day, one Carl Ramberg, plaintiff's intestate, was struck by a Dodge automobile driven by one Miller, who brought Ramberg to the police station and phoned the defendant of the accident. When struck by the automobile, Ramberg was hurled a distance of about 35 feet, and rendered unconscious. When the defendant arrived at the police station, nearly an hour after the accident, Ramberg was still unconscious, and he remained unconscious during the time the defendant waited upon him. The doctor examined Ramberg, but

found no bump, laceration, or contusion on his scalp. He found no blood in the ears, nose, or mouth, nor any cerebrospinal fluid coming from his ears. His eyes re-acted to light, and the pupils were equal, and not dilated. He found a rapid, fairly heavy pulse, observed that the respiration was neither shallow nor slow, and that the man's skin on the face was moist.

Ramberg was not undressed at the station, but was laid on the cement floor of the jail. It was in this position and condition that he was examined by the doctor, who permitted him to be left lying there. The defendant examined Ramberg's chest for fractures or crushing of the ribs; examined the clavicles; moved both arms, to see if there was any fracture or dislocation of shoulder joints or arms; examined the legs for fractures; felt of the hips for dislocation; and tested the knees, to determine nerve reflexes. There was no external evidence of any fracture. The only sign of blood was a small scratch on his right little finger, which was not bleeding at the time. The defendant did not prescribe anything. He diagnosed the case as intoxication, stating that he did not find any evidence of head injury. The doctor did not visit the police station the next morning, never saw the decedent again, and, as far as the evidence discloses, never made inquiry thereafter concerning Ramberg. The doctor was paid for his professional visit by Mr. Miller, the driver of the automobile that struck Ramberg.

The facts further disclose that Ramberg remained unconscious until about 5 o'clock on the following morning, when he was placed on a steel cot by one of the prisoners at the jail. Ramberg remained in a stuporous condition, sitting or lying on his bunk. Nobody paid any particular attention to him. He received no medical or surgical attention. He was given nothing to eat or drink. After the accident, he could not control his bowel or urine movements, and did not receive any attention at the jail in this particular.

Ramberg's brother came to the jail to take him home, about 7 P. M. on the evening of January 21st. He was still in a stuporous condition, and to all questions asked him, he answered, "I don't know." He did complain of his head. He couldn't walk straight. Upon the advice of the jailer, the brother left Ramberg in the jail. At 11:20 P. M. of January 21st, Ramberg was observed walking in the corridor of the jail. He said he

had an "awful headache." About 8:30 A. M. on January 22d, Ramberg was taken home by his daughter. Agnes, who was assisted by others. Ramberg was still in a stuporous condition, and did not seem to know what he was doing, and did very little talking. Upon his arrival home, he was bathed and put to bed.

On the afternoon of the 22d, he became very restless, and fought several times to get out of bed. He could not sleep. A Dr. Watkins was called, about 8 P. M. of January 22d, and the history of the case, as far as known to Mrs. Ramberg, was told to the doctor. He advised Mrs. Ramberg to keep cold cloths on Ramberg's head and to keep him quiet. Pyramidon tablets were prescribed. The next morning, Saturday, January 23d, he seemed more quiet; but during the day, he became restless, attempted to get out of bed, and tried to tear off his clothes. He kept rubbing his head. Saturday night, he grew worse, and on Sunday morning he acted so queerly that Mrs. Ramberg became frightened. Dr. Watkins was again called, and he ordered him sent to the hospital. From that time until Ramberg died, he was irrational, and so restless that he had to be confined in a straight jacket. No operation was performed or advised at this time, but an X-ray picture was taken, which showed a fracture of the sutures of the parietal and occipital bones, near the base of the skull. An autopsy confirmed the character of the injury. Ramberg died Monday evening, January 25, 1926, at 10 P. M.

What does the medical testimony show to be the usual and ordinary procedure in the diagnosis and treatment of patients suffering from an accident, and found to be still unconscious nearly an hour after the accident? That, under such circumstances, the attending physician has the right to assume that a head injury resulted, and acting upon such assumption, the attending physician should send the patient immediately to a hospital, for competent observation and treatment of the shock; that, if the patient recovers from the shock, a more thorough examination should be given, to determine the nature of the injury; that an X-ray picture should be taken, to discover if a fracture resulted; that, if the assumed diagnosis were confirmed, it was quite important to keep the patient in bed, and subject to constant observation, to determine whether the increased pressure of fluids within the skull—which pressure is always present after a head injury—was increasing; that palliative treatment should

be given, absolute quiet, induced by morphine, if necessary, proper catharsis, and ice caps to the head, to prevent the pressure from increasing; that it was necessary to know at all times how much the pressure was increasing, so that, if it reached a certain point, a subtemporal decompression operation could be performed, or the pressure lessened by spinal punctures; that a single observation and lay observations were worthless for this purpose. Sufficient to say that but one course of procedure was suggested by the medical experts as being proper. It is quite apparent, from this brief review of the facts, that a jury question was presented, and the trial court was justified in overruling the motion for a directed verdict on this phase of the case.

We now turn to the second issue. A traumatic injury was received by Ramberg. This cannot be disputed. The medical testimony is clear that the cause of Ramberg's death was  anæmia of the brain, or medullary œdema, due to pressure of fluid inside the skull. According to the opinion of the medical experts, based on the hospital charts, showing pulse, temperature, and respiration during the time Ramberg was in the hospital, and upon other facts in evidence, Ramberg's death, in all reasonable probability, was due to medullary œdema, resulting from increasing general intracranial pressure.

It may be observed at this point that the plaintiff does not plead that the cause of death was due to aggravation or acceleration of death, due to the alleged negligence of the defendant. However, the hypothetical questions put to the two medical experts of plaintiff involve this theory.

Plaintiff, in a case of this character, may not stop upon a showing that the treatment or absence thereof presents a jury question on the pleaded negligence, and then have the jury turned loose, to set up their own standards, as nonexperts, as to the proximate cause of death. The only recognized standard in such cases is essentially within the domain of expert testimony. See *Snearly v. McCarthy*, 180 Iowa 81. Nor is the value of expert opinion to be determined by counting noses, as in this case two physicians were called by the plaintiff, and three by the defendant, to testify on the proximate cause of death. See *Tomer v. Aiken*, 126 Iowa 114. But, if plaintiff's own medical experts are in doubt, and could not, on the hypothetical question put

to them, state with any reasonable certainty that the death of the decedent was aggravated or accelerated by the negligence of the defendant, how could a court or jury determine such proposition? It is obvious, under such circumstances, that the jury could do no more than guess or conjecture as to whether the death of plaintiff's intestate resulted from the original injury or from the defendant's lack of skillful treatment, or the absence of all treatment. The essentials of recovery in an action for malpractice are: (1) The treatment or lack of treatment; (2) that such treatment or lack of treatment is not regarded as proper by those skilled in the profession of medicine or surgery; and (3) that the injury or death resulted as the proximate result of such treatment or lack of treatment.

Was the injury resulting from the accident the proximate and efficient cause of death? The answer to this question determines this case. There must be causal connection between death of plaintiff's intestate and the negligence of the defendant, as alleged. There must be something more than a showing that the evidence is consistent with plaintiff's theory of the cause of death. The evidence must be such as to make that theory reasonably probable,—not merely possible,—and more probable than any other hypothesis based on such evidence. See *Tisher v. Union P. R. Co.*, 173 Iowa 567; *Neal v. Chicago, R. I. & P. R. Co.*, 129 Iowa 5; *Hawthorne v. Delano*, 172 Iowa 44; *Williams v. Cohn*, 201 Iowa 1121; *Hemminger v. City of Des Moines*, 199 Iowa 1302; *Matuschka v. Murphy*, 173 Wis. 484 (180 N. W. 821).

The ultimate and controlling issue in this case is referable to the cause of death of plaintiff's intestate. The finding of negligence in treatment by the defendant is not sufficient to warrant a recovery of damages. The language of the opinion in *Hawthorne v. Delano*, supra, is pertinent to the instant case.

"All that can be said is that such might have been the case, but this is a mere hypothesis. Other hypotheses could be advanced to account for his death, quite as plausible and quite as consistent with the testimony."

This means that the evidence offered by the plaintiff must tend to show a causal connection between the negligence charged and the resulting death. The evidence must justify an inference that the death resulted from such negligence, rather than from

some other cause. See *McNamee v. Hines,* 150 Minn. 97 (184 N. W. 675). In *Yaggle v. Allen,* 24 App. Div. 594 (48 N. Y. Supp. 827) (a malpractice case), it is said:

"Considering the evidence of these physicians in the view that is most favorable to the plaintiff, the most that can be said is that it is doubtful what caused the death of the deceased. We may even go a little further, and say that this death was caused either by the use of chloroform or from calcareous degeneration of the heart; we may guess or surmise as to which it was; but neither juries nor courts are permitted to render verdicts or judgments upon guesses or surmises."

Under the well established rules of decision, is it possible to say that Ramberg would not have died if he had been given medical attention such as is ordinarily given by medical practitioners of the same school in that community or similar localities? Can a jury of laymen make a finding on a question that plaintiff's own physicians cannot, with any certainty, answer? Clearly not.

The traumatic injury had its origin prior to the time that the defendant was called in a professional capacity. The injury was an adequate, probable, if not inevitable, cause of ultimate death. The plaintiff was bound to concede the original injury, and the burden was upon her to prove, by a fair preponderance, that the defendant's negligence was adequate as a probable cause of aggravation or acceleration of its fatality. To put it another way, it was necessary for the jury to find, upon proper evidence, that the death of the decedent would not have occurred on January 25, 1926, but for the alleged negligence charged against the defendant. It was incumbent upon the plaintiff to produce evidence to sustain such a finding.

We are in the presence of an undisputed adequate and probable cause of death. Such primary cause is consistent with every circumstance put in evidence. The principle may be conceded that a person who has negligently, by his acts of omission or commission, precipitated and prematurely caused death cannot escape responsibility, even though the disease or disorder probably would have resulted in death at a later time without his agency. See *Pentony v. Dudley,* 197 Iowa 744; *McCahill v. New York Transp. Co.,* 201 N. Y. 221 (94 N. E. 616); *Rogers v.*

*Kee,* 171 Mich. 551 (137 N. W. 260) ; *Clark v. George,* 148 Minn. 52 (180 N. W. 1011) ; *Baker v. Adkins* (Tex. Civ. App.), 278 S. W. 272; *Smith v. Mallinckrodt Chem. Works,* 212 Mo. App. 158 (251 S. W. 155).

The record in the case at bar emphasizes the fact that any conclusion with reference to the cause of death as being referable to the defendant's negligence is mere conjecture, and falls far short of that reasonable certainty which the law requires for the support of verdicts.

Let the record speak for itself. Plaintiff called Dr. J. A. Robbins, a duly licensed and practicing physician in Sioux City, and the then coroner of Woodbury County, Iowa. He conducted the autopsy on the body of Carl Ramberg. He testified that he found a partial separation of the right parietal from the occipital bone, with much blood settled under the scalp at that point, and that he satisfied himself as to what caused death; that he attributed the cause of death to a "severe head injury." Upon cross-examination, he was asked:

"The injury that you did find there was sufficient in itself to cause the death of Carl Ramberg, was it not?" He answered: "The injury I did find indicated that, in conjunction with the history of the case I had, there can be no question that this head injury, with whatever might happen inside the cranial cavity, was the cause of the death."

Let us turn to the testimony of one of plaintiff's medical experts (Dr. Carney), who answered, over objection, a hypothetical question, seven printed pages in length, with reference to the nature of the injury and the treatment given by the attending physician, that the treatment probably aggravated the condition or injury from which Ramberg was suffering, and that it probably did accelerate his death. He also stated that in the hypothetical question there was nothing that would indicate an intracranial hemorrhage, and that apparently no localized symptoms were present. He further stated that the shock itself might be severe enough to cause death; that it was impossible to tell from the hypothetical question whether the deceased had any symptoms of general pressure except in his throbbing headache; that the cause of death of the decedent was problematic; that:

"No one knows what this man died from exactly, you know. A diagnosis and prognosis without ever having seen the patient, upon a description of the patient's appearance and his symptoms, made by laymen, is very problematical. This man evidently had a sufficient injury to produce his death. Q. And whether any amount of surgical or medical interference,—medical attention had been given,—you do not know whether it would have changed the result, do you? A. I don't know. Q. So whether this man would have died if he had been taken to the hospital and given the best of care, you don't know? A. No."

The expert further testified, basing his answer on the hypothetical question, that:

"Ramberg may have had, for some reason or other, a secondary hemorrhage on Sunday or Saturday night. Q. And you can't express any opinion upon anything which this defendant did, or anything that the defendant failed to do, caused the death of this man? Nor you can't say that this man would have lived if he had received other treatment? A. No, I can't."

Plaintiff's other expert medical witness was asked the same hypothetical question, and in the first instance stated that he thought the treatment probably did aggravate the condition. He was then asked:

"What would you say as to whether or not the conditions as described to you in this question, which Carl Ramberg was subject to during the period he was confined in jail, from about midnight, January 20, to 8 or 9 o'clock, January 22, probably accelerated his death? A. I would have to answer, in any one case, I don't know as I could say. I would say in a series of cases that this sort of treatment would probably accelerate or possibly cause some of them to die sooner."

He also testified:

"Deceased evidently had a severe brain injury, and at the time he was seen, at midnight, January 20, 1926, he was probably in a state of concussion, and probably in shock."

On further examination, he said:

"I can't be certain that this man would have recovered if

he had had proper treatment. If a patient survives the concussion and the shock and dies, it is generally from intracranial pressure. He may die from infection following. Where there is an injury sufficient to cause a fracture of the skull at the suture between the parietal and occipital bones, you are quite likely to have intracranial pressure after the man comes out of the shock. Whether he [Ramberg] had an increasing pressure or not, up until a certain time before he died, it would be impossible to say. At least this pressure did not decrease to any extent, from the history I got here."

This, in brief, is the character of the testimony of the plaintiff's experts, upon which the jury was to speculate and guess as to whether the treatment or lack of treatment by the defendant, as the attending physician, caused the death of the decedent, or whether or not the original injury was an adequate, probable, and the proximate cause of death. It may be stated further that both of these experts, in answering the hypothetical question, stated that a person receiving a traumatic injury who lived 48 hours or more had a better chance of life, but admitted that the law of probability as applied to any particular individual in the class is "a mere guess." Dr. Carney testified:

"There may be ninety-nine out of a hundred who receive a certain injury that are going to die, and one may recover; but nothing in those statistics enables one to tell which one is going to be the fortunate one. I believe that this man did have a severe brain injury, and a severe brain injury causes death at times, in the face of the exercise of highest degree of skill and care."

It is sufficient to say that a physician, called as an expert, does not make a prognosis on statistics, because no two cases are alike; and plaintiff's experts could not say that, in any particular case, the fact that the patient lived 44 or 48 hours after the shock proved that he was not going to die. Damages may not be predicated on statistics of the character offered in the instant case.

The evidence offered by the plaintiff to establish the second issue does leave the cause of death a matter of conjecture. True, it was not necessary for plaintiff to prove the causal connection

by direct evidence, but substantial evidence must be furnished, upon which a reasonable basis for inference may be made. The proof must establish causal connection beyond the point of conjecture. It must show more than a possibility. Verdicts must rest upon reasonable certainty of proof. Where the proof discloses that a given result may have occurred by reason of more than one proximate cause, and the jury can do no more than guess or speculate as to which was, in fact, the efficient cause, the submission of such choice to the jury has been consistently condemned by this court and by other courts. Plaintiff's theory is not established unless the evidence is such that all other reasonable hypotheses are excluded. It was not established here.

The motion of defendant for a directed verdict should have been sustained. Wherefore, the judgment entered is—*Reversed.*

STEVENS, C. J., and ALBERT, MORLING, and WAGNER, JJ., concur.

KINDIG, J., not participating.