ROSTRON *v.* KLEIN

1. PHYSICIANS AND SURGEONS—MALPRACTICE—EVIDENCE—QUESTION FOR JURY.

Evidence that defendant physician had examined plaintiff's decedent husband following a fainting spell during which decedent had injured his head, that defendant during this examination had the record before him of decedent's fainting spell the year before when defendant also had been the examining physician, that defendant not only failed to have decedent's head X-rayed but also did not examine it in any way, that defendant admitted the possibility of a head injury had never occurred to him and that when plaintiff arrived at the hospital, the decedent was unable to tell her what had happened or to move his right hand, together with testimony of another physician about his treatment of decedent and the standard of care in the community, was sufficient to go to the jury regarding defendant's malpractice since reasonable men might find that an adequately developed history of decedent's two fainting episodes would clearly have distinguished them and would have raised the question of a head injury.

---

REFERENCE FOR POINTS IN HEADNOTES

[1-4] 41 Am Jur, Physicians and Surgeons § 78 *et seq.*

2. PHYSICIANS AND SURGEONS—MALPRACTICE—WITNESSES—EXPERT
   —EVIDENCE—SUFFICIENCY.

> Testimony of a neurosurgeon who had operated on plaintiff's
> decedent to relieve an epidural hematoma after defendant
> physician had failed to diagnose it regarding the community
> standard of medical care in head injury cases, was sufficient
> to put the question before the jury whether defendant
> physician had been negligent in failing to ascertain if plain-
> tiff's decedent, when he fainted, had fallen and had sus-
> tained a resultant head injury.

3. PHYSICIANS AND SURGEONS — NEGLIGENCE — EMERGENCY — BEST
   JUDGMENT.

> A doctor is not chargeable with negligence when he acts ac-
> cording to his best judgment in an emergency, provided he
> has informed himself of the facts, circumstances and existing
> conditions of the injury to his patient.

4. PHYSICIANS AND SURGEONS — NEGLIGENCE — EXAMINATION —
   DIAGNOSIS.

> A patient who is treated by a physician is entitled to a
> thorough and careful examination, such as the condition of
> the patient and the attending circumstances will permit, with
> such diligence and methods of diagnosis for discovering the
> nature of the ailment as are usually approved and practiced
> by medical men of ordinary or average learning, judgment,
> and skill in that community or similar localities.

Appeal from Macomb, Alton H. Noe, J. Sub-
mitted Division 2 March 11, 1970, at Detroit.
(Docket No. 6,448.) Decided April 24, 1970. Re-
hearing denied May 28, 1970. Leave to appeal
denied August 4, 1970. 383 Mich 814.

Complaint by Betty Rostron, administratrix of
the estate of Herschel Elrod, deceased, against A.
A. Klein, M.D. and Memorial Hospital of Warren,
a Michigan corporation, for malpractice. Directed
verdict for defendants. Plaintiff appeals. Reversed
and remanded.

*Moss, Williams & Smith,* for plaintiffs.

*Plunkett, Cooney, Rutt & Peacock,* for defendants.

Before: T. M. Burns, P. J., and Holbrook and Bronson, JJ.

T. M. Burns, P. J.  On December 11, 1964, plaintiff's decedent, Herschel Elrod, while standing in a service station, suddenly fell backwards, striking his head on the concrete floor where he remained unconscious for some time.

The Warren Fire Department was called and then an ambulance was summoned.  By the time the ambulance arrived, Mr. Elrod had regained consciousness and expressed a desire to go home rather than to the hospital.  A Mr. Elmer Arnold told the ambulance attendants to watch out for Mr. Elrod's head as he had received quite a "lick" on it.  Mr. Elrod was taken to the Warren Memorial Hospital, where he was seen by Dr. Klein, who coincidentally, had seen him the year before when he was brought into the hospital because of an apparent seizure.  Dr. Klein had the record of the prior episode in front of him during his examination.  He checked Mr. Elrod's blood pressure, reflexes, heart and lungs.  He also examined eye movements and reaction to light.  He further testified that he inquired of Mr. Elrod how he felt and that Mr. Elrod responded that he felt okay.  Dr. Klein asked Mr. Elrod if he had been drinking and was told that he had at least one beer.  Based upon his examination and the prior history, Dr. Klein testified that as far as he was concerned, at the time he thought Mr. Elrod had had another fainting spell.

Dr. Klein further testified that at no time did he ask Mr. Elrod about striking his head when he

fainted. The question of a possible head injury never occurred to Dr. Klein for he testified:

"*A*. No. I didn't ask the question specifically because there was no—there was no question of head injury when he was brought in. As far as I know he had had another episode of fainting and strictly coincidentally, the reason I say coincidentally the fact that I saw him in '64 was strictly coincidental. It just happened to turn out that it was my turn a year later to take whatever emergency that came in. There was no question of any head injury whatsoever.

"In fact, looking back on the year before seeing— that I had seen him the year before, as far as I was concerned he had another episode he had the year before and there was no question of head injury the year before."

Although there was no evidence of the incontinence of bowels and bladder on the occasion in question as there had been the year before, Dr. Klein did not consider this sufficiently significant to distinguish the two situations. Dr. Klein did not order an X-ray nor did he examine Mr. Elrod's head in any way. Dr. Klein decided that there was nothing the matter with Mr. Elrod and discharged him.

When the plaintiff arrived at the hospital to take her husband home, he was unable to tell her what had happened. He appeared to be unable to move his right hand and was sick to his stomach several times. After going to the service station in order to ascertain what had happened to her husband, plaintiff went home where she needed assistance in getting him inside.

She then called the Warren Memorial Hospital and was told that according to their records, there was nothing the matter with her husband. After she described the way he was acting, she was instructed to take him to a hospital. An ambulance

was summoned and Mr. Elrod was taken to St. John's Hospital where he was examined by Dr. William Haddad. Dr. Haddad recommended immediate surgery to relieve pressure caused by a blood clot which X-rays had revealed on the anterior portion of the brain.

The chances of success for the operation were not good at this juncture, because of the time that had elapsed since the injury. Mr. Elrod died the next day from epidural hematoma suffered as a result of the skull fracture and internal bleeding.

Plaintiff brought suit for malpractice against Dr. Klein for failing to diagnose the skull fracture and cranial bleeding which resulted in Mr. Elrod's death. Memorial Hospital of Warren was also sued. Plaintiff made a timely demand for jury trial. The trial judge granted defendants' motion for directed verdict at the close of plaintiff's case saying among other things that:

"The situation here is a little different, and I think we have an answer to the actual question which does come up here from the only medical witness and disinterested witnesses who testified that—that is Doctor Haddad, and specifically he was asked the question and the reporter has given us the benefit of those remarks here as to whether the exercise of medical judgment by Doctor Klein based upon the information which was available to him at the time, history, the appearance of the man, and the fact that he apparently had recovered sufficiently; he was permitted to leave the emergency room.

"Doctor Haddad was asked whether such a practice on the part of Doctor Klein would not be a matter of judgment in the exercise of proper medical judgment, and not violative of the standards of practice in the community.

"Now, this is the only testimony we have. We have no other, and it seems to me that the motion

of the defendant must be granted for the reason that the plaintiffs have not sustained the burden in proving, so far as the hospital is concerned, this involvement, this responsibility, and so far as Doctor Klein is concerned, any violation of the standards of practice to which he subscribes as a medical doctor.

"What was done in this case was an exercise of judgment. He did what he thought was proper under the circumstances that he had before seen this patient under somewhat similar conditions, and had advised him to seek help from his own doctor.

"Not, this is—this man being capable of, and having recovered apparently from this fainting situation and prior history of it which Doctor Klein was familiar, his advice to see his own doctor. Apparently this was considered by the expert witness as sufficient to satisfy the standards of practice to which all doctors have subscribed.

"For these reasons stated, the motion will be granted."

Plaintiff appeals the directed verdict only as it applied to defendant Dr. Klein. The only issue on appeal is whether or not plaintiff presented sufficient evidence to place the case before the jury.

We find that there was sufficient evidence to go to the jury. After an examination of the record, we cannot agree with the trial court that Dr. Klein's examination of plaintiff's decedent was sufficient to satisfy the standards of practice in the community as a matter of law.

It seems clear to this Court that there is a very real possibility that Mr. Elrod would have been better served had he not seen by coincidence the same doctor he saw the year before. We find that reasonable men might find that an adequately developed history of the two episodes would clearly have distinguished them and raised the question of

a head injury which Dr. Klein, by his own testimony, never even considered. Our conclusion is based largely upon the testimony of Doctors Klein and Haddad. However, we are aided in this conclusion by the uncontradicted testimony of the plaintiff that when she arrived at the hospital, the deceased was unable to tell her what had happened or to move his right hand.

The defendant relies primarily upon the fact that this was an emergency situation and the alleged failure of the plaintiff to prove that Dr. Klein violated the standards of care in the community.

We do not believe that the defendant would seriously argue that his failure to order an X-ray or to examine decedent's head in some way likely to ascertain the extent of the injury would not have been negligent had the fact that Mr. Elrod struck his head as he fell been known to him. In any event, we find the testimony of Dr. Haddad as to the standard of care in cases involving head injuries to be sufficient to put the question before the jury if they were to find the defendant negligent in failing to ascertain that there had been a fall and resultant head injury.[*]

Certainly as the defendant asserts when a doctor in an emergency situation acts according to his best judgment, he is not chargeable with negligence. *Daniel* v. *McNamara* (1968), 10 Mich App 299; *Luka* v. *Lowrie* (1912), 171 Mich 122. Yet as the Court said in *Dailey* v. *Shaffer* (1914), 178 Mich 574, 578:

"This exception to the ordinary rule of negligence is based upon the assumption that the physician has informed himself of the existing conditions. Without a knowledge of these, he has no proper basis upon which he can exercise his discretion."

---

[*] See appendix, *post.*

For as the Court said in *Luka* v. *Lowrie, supra,* at pp 132, 133:

"The distinction between an error of judgment and negligence is not easily determined. It would seem, however, that if one, assuming a responsibility as an expert, possesses a knowledge of the facts and circumstances connected with the duty he is about to perform, and, bringing to bear all his professional experience and skill, weighs those facts and circumstances, and decides upon a course of action which he faithfully attempts to carry out, then want of success, if due to such course of action, would be due to error of judgment, and not to negligence. *But if he omits to inform himself as to the facts and circumstances or does not possess the knowledge, experience, or skill which he professes, then a failure if caused thereby, would be negligence."* (Emphasis added.)

We consider that a jury might properly view Dr. Klein's conduct as negligent because of his failure to inform himself of the facts and circumstances concerning Mr. Elrod's injury.

"Defendant properly claims that a doctor is not liable for a mistake in diagnosis; but this is not true if he is negligent in making a proper examination.

"In *Fortner* v. *Koch* (1935), 272 Mich 273 (38 NCCA 334), this Court quoted with approval the rule set forth in *Ramberg* v. *Morgan* (1928), 209 Iowa 474 (218 NW 492):

" 'The law is well settled that a patient who is treated by a physician is entitled to a thorough and careful examination, such as the condition of the patient and the attending circumstances will permit, with such diligence and methods of diagnosis for discovering the nature of the ailment as are usually approved and practiced by medical men of ordinary or average learning, judgment, and skill in that

community or similar localities.'"  *Johnson* v.
*Borland* (1947), 317 Mich 225, 231.

Therefore, upon this record we conclude that the
trial court erred in directing a verdict for Dr. Klein.
The question of whether his examination was negli-
gent under the circumstances is for the jury.

Reversed and remanded.  Costs to plaintiff.

All concurred.

## APPENDIX

The testimony of Dr. Benjamin F. Haddad con-
cerning the standard of care in the community.

"*Q.* (*By Mr. Williams, continuing*):  Now, you
stated in your answer, Doctor Haddad, that you
would—inquire of others?  Is this the standard
procedure?

"*A.* Yes, it is.

"*Q.* Would this include the persons who brought
the patient to the hospital?

"*A.* Yes.

"*Q.* As part of your examination or is it standard
procedure that you would ask the patient if he hurt
anywhere?

"*A.* Yes.

"*Q.* And you'd stated before that this type of
injury is painful; is that correct?

"*A.* Yes.

"*Q.* And what—what is the standard procedure
in examining the head or looking at the head?

"*A.* Well, you not only look at it, but usually feel
it, and note any irregularities, masses, tenderness,
discoloration, size, shape.

"*Q.* Is it standard procedure, Doctor, to take
X-rays?

"*A.* Yes.

"*Q.* You would in fact do this?

"*A.* Yes, with this history.

"*Q.* Would the fact that the patient had been
given oxygen from the time that he was transferred

—during the time he was being transported to the hospital have any bearing on what you would do?

"*A*. No, it wouldn't change what I would do.

"*Q*. Would that indicate anything more serious than mere unconsciousness?

"*A*. Not necessarily because I would feel that the ambulance attendants might want to give the person oxygen with very little provocation if they felt— the least bit discomfort regarding the patient's condition so that they might give him oxygen when he didn't really need it, so it wouldn't really sway me as to what I should do next.

"*Q*. In epidural hematomas, from your experience, how soon—how soon after the injury or the trauma do the symptoms of paralysis occur?

"*A*. Well, in general they occur within a few hours.

"*Q*. Within a few hours?

"*A*. Right.

"*Q*. Now, is it—what is the general practice after you have examined the person in the emergency room and these tests are say negative?

"*A*. You mean including X-rays?

"*Q*. No, not—

"*A*. Just the physical exam?

"*Q*. Yes.

"*A*. Well, we usually, with a patient who has had a history of unconsciousness with a head injury, would admit the patient to the hospital for further observations; at least overnight.

"*Q*. Why do—would you do this, Doctor?

"*A*. Well, just to prevent any development of serious complications following a head injury which may not be apparent at the time that you first see them. We use the level of consciousness as a rough guide as to whether or not we would keep a patient in the hospital or not.

"*Q*. You stated that the symptoms of paralysis are associated with epidural hematoma not to occur for several hours?

"*A*. That's right.

"*Q.* Could they also occur almost immediately afterwards?

"*A.* Yes, they might.

"*Q.* And is the reason that you keep the person under observation that the signs or symptoms may not occur right away?

"*A.* That's right.

"*Q.* How important is time in treating an epidural hematoma?

"*A.* Well, it is of marked importance in a case of arterial bleeding episode in the head. Every few minutes would make quite a difference because you never known [*sic*] when the irreversible trend, stage would have been reached. Obviously if [*sic*] can get a hold of this patient prior to the development of serious compromise of the brain, why you may end up with a patient who is cured so to speak, if he is cared for promptly in comparison to the one who may be seriously handicapped or difficult.

"*Q.* Do you know when this irreversible trend or time takes place?

"*A.* No, I do not know.

"*Q.* Does anyone know?

"*A.* I don't think so.

"*Q.* It could take place immediately?

"*A.* Well, no. If it happens immediately the patient is dead.

"*Q.* Well, within a half hour?

"*A.* No, I wouldn't say so in my experience. Generally speaking if you have seen the patient within a half hour after the onset of the bleeding you should have a good chance of having a survival.

"*Q.* When does the bleeding begin?

"*A.* Well, that's hard to say. I would assume that it begins promptly after the injury.

"*Q.* Would a two-hour delay in treating a man suffering from an epidural hematoma have an effect on whether he recovered or not?

"*A.* Well, the time depends also—the answer to this question really isn't just a matter of time. It also depends on the patient's condition. You see he

would have to describe what his condition is like.
For instance, a two-hour delay in a person who is
just beginning to lose consciousness say or who is
beginning to show weakness of one side or just
beginning to show a speech disturbance, you still
have a chance of getting a good result if you can
do something quickly, but if he is on the other hand
unconscious, paralyzed and convulsing generally,
and having difficulty with his respiration so that
these various vital functions are being impaired,
you don't have much time to try to get a good result
from him any longer. You have to act very quickly
and people do not develop these symptoms at a
constant time. You can't say that all people with
epidural hematoma after two hours or four hours,
no matter what you do, they are going to die, see.
It just doesn't happen that way.

"*Q.* You have stated that it would be standard
procedure to keep the person in the hospital under
observations. Does the fact that the patient is
moving around, walking around, being transported
in an automobile, being carried by inexperienced
people, does this have any effect on the person
suffering from this epidural hematoma?

"*A.* No, I don't think so.

"*Q.* It wouldn't be better then to have the person
lying in a bed?

"*A.* It's not too important what his posture is
as it is to have a trained observer seeing what
happens to him from moment to moment.

"*Q.* Doctor, would your methods, then, and pro-
cedure for examining a patient in an emergency
room correspond to the other ordinary methods and
procedures of other doctors in your area?

"*A.* Well, I think they are fairly close.

"*Q.* Doctor, I don't know—I don't know if you can
answer this question or if anyone can answer this
question. Would Mr. Elrod been saved if you had
seen him two hours earlier?

"*A.* Well, I don't think I can answer that because
I have no way of knowing what his brain stem was

like two hours before, actually, and I've seen people who have been deathly ill who recover, in other words, even individuals as ill as he was who may recover after you have operated on them because you just haven't gotten quite to this point where no matter what you do it is not going to help. I don't know any way of establishing that.

"*Mr. Williams:* I have no further questions at this time."

### Cross Examination

*By Mr. Peacock:*

"Q. Doctor Haddad, you indicated a few minutes ago that you felt that your treatment for a person that you described as somebody being brought into the emergency room with a head injury would be fairly close to those of other doctors; is that right?

"A. In the area where I practice.

"Q. Now, Doctor, that would indicate that some doctors where you practice do something a little bit different than you do?

"A. That's right.

"Q. And if they do something different you are not telling this court and jury that they are not within the standards of practice, are you?

"A. That's right.

"Q. You are saying that even though they are different they still are within the standards of practice as you know them in the area where you practice?

"A. That's right. There is a range.

"Q. Doctor, these standards of practice that the judge has mentioned to the jury and we have been talking about, these aren't a group of written rules, are they?

"A. No, I don't think they are.

"Q. A lot of these the standard of practice depends upon the individual doctor's judgment, does it not?

"A. That is right.

"*Q.* And he alone, on viewing a patient, if he is the only one that sees the patient, that makes his own judgment based upon what he talks to the patient about; if he does talk to him, and what his physical examination discloses?

"*A.* That's true.

"*Q.* And if he wants to call in consultation to talk with the consultant, after the consultation has taken place?

"*A.* That's true.

"*Q.* Now, Doctor, counsel has indicated and presented you with a hypothetical set of facts indicating a man being brought into the emergency room with a head injury. Doctor, there are a number of other people who come into the emergency room who do not have head injuries, don't they?

"*A.* That's right.

"*Q.* A number of people who have epilepsy are often brought to the emergency room?

"*A.* That's true.

"*Q.* And Doctor, every time you have a patient with an epileptic seizure you don't ordinarily order X-rays of his head, do you?

"*A.* If I haven't seen the patient before or if he has not had a previous examination by X-rays. In other words, if this is an initial attack and without any particular warning then we do X-ray the skull.

"*Q.* All right. Now, Doctor, on other cases other than epilepsy where people come in who are not or who have not been injured let's say or just come in because they don't feel good—

"*A.* Yes.

"*Q.* —you don't always X-ray them do you?

"*A.* That is right, you do not.

"*Q.* X-ray, again, Doctor a matter of taking an X-ray, Doctor, is again a matter of judgment on the part of the examiner, is it not, sir?

"*A.* Yes, it is.

"*Q*. And if a doctor doesn't order an X-ray that doesn't make him violative of standards of practice, does it?

"*A*. Well, not—if you are referring at any particular frame of reference.

"*Q*. I'm talking simply this is the doctor's judgment who is looking at that patient that he doesn't need an X-ray, then if he doesn't take an X-ray he is not violative of the standards of practice, is he?

"*A*. No, I wouldn't think so.

"*Q*. Okay. Doctor, you have before you the record of Mr. Elrod not only from December the 11th, 1964, but also a record of March the 4th, 1963. You see that, sir?

"*A*. Yes, I do.

"*Q*. All right. Now, Doctor, the proofs in this case are going to show that it happen to be a coincident [*sic*] that Doctor Klein happened to see this man in 1963 when he was brought into the emergency room and he also saw him in '64 when he was brought in December the 11th. In looking at the 1963 admissions to the emergency room, you can see that Doctor Klein indicated a possible convulsive attack down near the bottom?

"*A*. Yes, he has question mark, convulsive episode I believe. If I am reading it properly.

"*Q*. All right. Doctor, can you read what Doctor Klein did on that examination March of 1963?

"*A*. He records the blood pressure as being 130 over 70, eye ground negative, heart and lungs negative, reflexes normal.

"*Q*. What is this eye ground examination, Doctor? You mention in your exam, too?

"*A*. Yes. You look into the eye through the pupil with a light. There is a mirror on there so that the light is reflected back and you can see the eyeball on the inside where there are—where the optic nerve is and some blood vessels and the reason it is done is because if there is increase in pressure within the head is [*sic*] this is transmitted to the back of the eyeball and you can see the swelling that's produced.

It's an indication of increased pressure within the head.

"*Q.* I see. This is an area that if there is increased pressure it should give you some warning that there is something wrong with the patient?

"*A.* Yes.

"*Q.* And it is—if it is normal, Doctor, as you look at it, what does that indicate to you?

"*A.* Nothing except that it is normal.

"*Q.* All right. Now, what about the other items on there that you indicated outside the eye ground. You say the heart?

"*A.* Heart and lungs negative. I assume he listened to the chest and heard the heart sounds and the breath sounds and they were normal and his reflexes were normal. He doesn't say which one, but I assume he probably checked this; the patient's reflexes and ankle and the elbow.

"*Q.* Would this be in a group of reflexes that you described, the Babinski?

"*A.* Well, he may or may not have done that. I can't tell.

"*Q.* In other words—

"*A.* They don't always do it.

"*Q.* Pardon me.

"*A.* Every individual doesn't necessarily do this.

"*Q.* In other words, a doctor who does not do the Babinski is not violative of the standards of practice when he does a reflex test?

"*A.* That's true, it may be so.

"*Q.* All right. Now, Doctor, would this record of 1963 which—would you now go to the '64 record? In your experience, Doctor, as a neurosurgeon and somebody who is worked [*sic*] in the emergency room over the years, when a patient is brought in that's alert and cooperative and is able to discuss matters with you, you ordinarily ask him what happened?

"*A.* Yes, I do.

"*Q.* And if there are no observers as you indicated that were around at the time of either an

accident or seizure of a person you have to rely pretty much upon what the patient tells you, don't you?

"*A.* That is right.

"*Q.* And if a doctor does rely basically on what the patient tells him he is not violative of the standards of practice is he?

"*A.* No, he is not.

"*Q.* Doctor, every time—strike that. Doctor, when a person is described as being well-oriented could you tell the court and the jury what that means?

"*A.* Yes. It means that the patient usually knows where he is, what the date is and what his name is; maybe his address. In other words, he is in contact with the environment as to his orientation in space and time.

"*Q.* He is in contact with reality; isn't he?

"*A.* Right.

"*Q.* Doctor, when a person has pupils that are equal and regular, what does that mean to you, sir, when you do an examination?

"*A.* This is the normal state. But pupils in most individuals are round and they are equal diameter. In some instances where you have an increasing pressure within the head one pupil becomes larger than the other or in some evidences of brain damage. The pupils may be markedly constricted or they may be irregular in shape, not round, but oval or some other.

"*Q.* All right. And, Doctor, when the indication of extraocular movements is being normal, what does that signify, Doctor?

"*A.* That means the eyeballs would turn in various directions in a normal fashion. In other words, one eye wouldn't deviate outside the line of sight.

"*Q.* Is this a normal test, Doctor, that's given to people when they are brought into emergency?

"*A.* Yes, frequently with a history of head injury.

"*Q.* All right.   And what is the significance of
the fact that they are able to move back the eyes
systematically together or up and down or sideways;
does that—there is—it is another sign there is no
brain damage or nerve damage?   Would the fact
that it has to do with nerves be a part of the
neurological examination?

"*A.* Yes, sir, it would.

"*Q.* All right.   Now, you've already told us what
the eye ground examinations were.   How would a
head injury reflect itself in the heart or lungs
examination?

"*A.* Well, there wouldn't be much of a reflection in
the lung.   In the heart you might get an alteration
of pulse rate or blood pressure, but usually these
alterations don't occur with any regularity unless
the patient is becoming increasingly unconscious.
In other words, the pulse rate might fluctuate; blood
pressure might fluctuate and this is one of the rea-
sons why we take these measurements periodically
when we observe the patient like every half hour
or every hour or something like that.

"*Q.* All right.   Now, Doctor, what is the signifi-
cance of a muscle strength being good on these
examinations?

"*A.* Well, it is a test of weakness or strength if
it is equal or nearly so, why you figure there isn't
any brain damage that controls the muscles of one
side of the body.

"*Q.* Doctor, would these type of examinations be
consistent with a person who would be examined for
a possible convulsion?

"*A.* Yes, they would.

"*Q.* And would they be consistent with a person
who would be examined for a possible head injury?

"*A.* Yes.

"*Q.* And if all of the tests that were given that I
described indicate a negative response, would you
say it was contrary to the standards of practice for

this person to be released and to see his own doctor in the morning?

"*A*. Well, I think there is a difference of opinion here with a patient whose [*sic*] had a history of being unconscious. I wouldn't—

"*Q*. Doctor, are you saying there is a difference of opinion?

"*A*. Right. I'm not evading the question.

"*Q*. We get into the question of judgment?

"*A*. Right.

"*Q*. It would be your judgment?

"*A*. That's right.

"*Q*. In such a situation that possibly he would keep him or view him in there to watch him, right?

"*A*. Right.

"*Q*. It might be some other doctor's judgment, having found all of the items to be clear and negative, to release him to his own medical doctor?

"*A*. That's right.

"*Q*. And the fact that he does that doesn't make him violative of the standards of practice?

"*A*. Well, I think you are right. That's true. You wouldn't violate standards of practice by using judgment like that.

"*Q*. Doctor, I assume you are familiar with the fact that we—you probably have read in the newspaper about boxers fighting after a fight is over they go to their dressing room, get dressed and once in a while one of them will drop dead three hours afterwards from a blood clot up there. This is probably a situation that you have described where the thing do not become apparent for an hour or two hours or three hours after a blod [*sic*] been sufficiently too hard to give that kind of clot?

"*A*. That's right.

"*Q*. And I think you've also described to the court and the jury that everyone of us are a little bit different and there is no standard by which John Peacock would show signs or Benjamin Haddad, Judge Noe or any members of this jury would show

a constant time that they would begin to show signs; is that right?

"*A.* That's right.

"*Q.* I might show it in 20 minutes; you might show it in an hour; Judge Noe might not show it for two hours and some members of the jury might not show it for a day; is that right?

"*A.* That's right.

"*Q.* Doctor, if I understood you in response to one of Mr. William's questions, I understood you to say that you use a degree of consciousness of the patient as a guide as to whether to keep them overnight or not?

"*A.* That's true.

"*Q.* Now, when you say the consciousness of the patient, do I understand that if a person was somewhat groggy or exhibited some signs that would be called positive signs, that this would be the type of degree of consciousness that would influence you to put a man in bed?

"*A.* Well, you said grogginess. Now, that's—

"*Q.* All right. I'm sorry. What does grogginess have or have not to do with this?

"*A.* It is sort of a general term. I wouldn't want to use the term just grogginess because in my own definition of grogginess would not necessarily mean that he was unconscious, but what I'm—what—when I mentioned unconsciousness, I'm asking was the patient unaware of what was going on around him briefly after the injury or was he unaware at anytime that—wasn't in contact with the environment or was he amnesic. This is a form of unconsciousness also.

"*Q.* That would mean, Doctor, not being oriented?

"*A.* That's right. He didn't have a memory or recollection of the events which occurred. Now, if they have those kinds of aberrations of consciousness, we are a little bit worried about him, and would want to keep them.

"*Q.* And, Doctor, the degree of consciousness, then, that you see the patient at the time you see

him in the emergency room, if I understand you right, is not too important?

"*A.* That's right.

"*Q.* You are more concerned about what happened back at the time that he had the injury?

"*A.* That's right.

"*Q.* Doctor, does the record show the time that Mr. Elrod was admitted to St. John's Hospital?

"*A.* 11:25 p.m.

"*Q.* All right. And as I understand you already testified that the surgery that you did on Mr. Elrod commenced at 3 o'clock and lasted until 4:30; is that right?

"*A.* Right.

"*Q.* So it would be approximately three and a half hours that he was in the hospital before surgery was done?

"*A.* That's right.

"*Q.* And then, of course, from the time he left Warren Memorial, which was indicated around 7 o'clock, it would be some seven and a half hours after the visit to Warren Memorial; is that right?

"*A.* That's right."