GEORGE ELSEY, JR., Plaintiff, *v.* ADIRONDACK AND ST. LAWRENCE RAILROAD COMPANY, Defendant.

(Supreme Court, St. Lawrence Trial Term, October, 1916.)

Injunctions — contamination of water of spring — when injunction granted.

> Where upon an embankment made of rock, sand and pyrites tailings defendant's railway ran through plaintiff's farm and in the vicinity of a spring, his only available water supply, and after defendant with knowledge that the tailings, the composition of which could have been learned by an analysis, had contaminated the water of the spring, pumped it out upon several occasions and removed the sediment, giving only temporary relief, plaintiff will be granted an injunction enjoining defendant from continuing the contamination.

18

Supreme Court, October, 1916.　　　・[Vol. 97.

Action for an injunction and for damages.

D. R. P. Parker and George H. Bowers, for plaintiff.

G. T. Chaney, for defendant.

Whitmyer, J.　The action is for an injunction and for damages.　Plaintiff owns a farm consisting of 196 acres in the town of DeKalb, St. Lawrence county, N. Y., upon which he maintains about forty-five head of cattle and four or five horses.　He bought it March 16, 1905.　The defendant company was incorporated in 1906.　Its railroad was built by a predecessor a few years before plaintiff bought, but was not under operation at that time.　The road runs through the farm for a distance of twelve hundred feet on an embankment, from twelve to fourteen feet high, made of rock, sand and pyrites tailings.　A ditch is at the foot of the embankment and carries surface water northerly for a distance and thence to the westerly side by a conduit running through it.　The tailings are from a pyrites mill, located about a mile southerly from the farm. They come from the metal in the separation of the ore from the rock.　They contain iron and sulphur.　The iron comes out in oxidized form and looks rusty.　The sulphur goes to make sulphuric acid, which dissolves in solution.　The seepings contain aluminum and sulphate of iron, forming an aluminum sulphate compound.　When thrown and left on the ground, oxidation of the air, together with rain and moisture, will dissolve the ingredients and carry them into the ground.　Water contains alkaline properties, bicarbonate of soda, calcium and magnesia and when the compound comes in contact with those properties a white precipitate, in the carbonate form, aluminium hydroxide, is formed.　And it is not potable.　A spring, blasted out of rock and ten feet deep in the

deepest place is at the foot and on the east side of the embankment. It is supplied through a crevice in the center and is surrounded by a wall, laid up with stone and water lime and extending two or two and one-half feet above the surface of the ground and several feet below. Plaintiff testified that the wall rests partly on rock and partly on dirt around the spring. Professor Hulett testified that he. could not see clearly but thought that it was built in open stone work below. And defendant's superintendent testified that it rests entirely on rock. The spring was blasted in 1874. Before that time, water was obtained from a run in a ravine, about five rods easterly. It ran toward the location of the spring. When it broke out at the spring, the quantity at the run decreased. Water is there now to a depth of about four inches, except in the spring of the year, when there is more. When it broke out at the spring, the then owner dug out and blasted there and found an abundance. Since that time that has been the source of supply and plaintiff says it is the only available one. The water has been used for domestic purposes and for the stock, being piped to a vat or trough near the barns, a distance of about twenty-five rods. And it was always clear, pleasant to the taste and potable until the fall of 1909. At that time a white sediment appeared in the spring. There was a change in the appearance and in the taste of the water and the cattle would not drink. A cow became sick and died after drinking it. Examination shows that the sediment extended to the pipes and vats. An analysis showed that the ingredients of tailings were present, and that the same ingredients, which are high in tailings, were high in the water. There is some dispute as to whether or not tailings were used in the construction of the embankment.

Plaintiff claims that they were. Defendant claims that they were not. And Foster, section foreman from 1907 to 1914, says that they were there, but in an oxidized form, when he took charge. In that year he covered the top and sides of the embankment with tailings to a depth of about six inches, but none have been used since. Plaintiff, when he learned about the situation, complained to defendant and defendant pumped out the water and removed the sediment. It has done so on three different occasions, once in 1910, or thereabouts, the second time in 1912, and the third in 1914, after the action was commenced, but the improvement was only temporary each time, so that plaintiff commenced the action. A jury was impanelled at the trial and five questions were submitted. The findings were (1) that the ingredients of tailings find their way from the embankment into the spring; (2) that defendant did not know and could not have known that they would contaminate the spring if carried into it; (3) that defendant did not know and could not have known that oxidation would dissolve and rain and moisture carry them into the ground in such a way that they would reach and contaminate it; (4) that the annual damage is $50; and (5) that the fee damage is $750. Plaintiff concedes that the ingredients of tailings do not reach the spring over the surface of the ground, but claims they soak into the ground and reach the spring under the wall, where it rests on dirt. And defendant concedes that they reach and does not now dispute that they pollute the spring, but claims that a subterranean stream is the carrier and that it is not liable, under the findings of the jury as to lack of knowledge and because it did not know and could not have learned about the presence, location and direction of such a stream. If defendant did not know the composition of tailings, it could have learned by procuring

an analysis.  That would have furnished information that the ingredients would certainly pollute the spring, if they reached it.  And, with the spring located as it is, defendant is chargeable with the knowledge that they would be likely to reach it, either by way of a subterranean stream or by soaking into and through the ground.  It seems clear that they are not carried by a subterranean stream from the direction of the embankment, because the embankment is fourteen feet high and its foundation is of rock, through which the same must be carried before they can reach a stream.  And they cannot reach the stream, which feeds the spring, because that, the evidence shows, comes from the direction of the run.  So that it seems clear that they must be and are carried down the side of the embankment into the ditch and then into the ground and under the wall, where it rests on dirt.  Moreover, after complaint was made, defendant cleaned the spring three times, the last time after the action was commenced.  If it did not know before, it learned the situation when it commenced to clean, and it then became its duty to remove the cause.  The action is maintainable.  29 Cyc. 1178; 40 id. 631; *Dillon* v. *Acme Oil Co.,* 49 Hun, 565; *Brown* v. *Illius,* 27 Conn. 84.  The case of *Dillon* v. *Acme Oil Co.,* cited by defendant, is distinguishable.  There plaintiff's well was located at a distance of twenty rods from defendant's refinery and a public street and a railroad, with several tracks, intervened.  And it was found as a fact that defendant's works were constructed and operated as well as such works could be, having reference to the location and nature of the business.  The findings as to lack of knowledge are not adopted.  The other findings are adopted.

Judgment accordingly.