OPINION OF THE COURT
Gerard M. Weisberg, J.
This claim for personal injuries is predicated upon the theory that the State of New York negligently stored rock salt at a Department of Transportation facility known as the Shirley Yard, causing quantities of salt water to seep into the ground and percolate into claimants’ well. It is alleged that as a result of consuming salt-contaminated water from this well, claimant Daniel Meehan’s children, Nicole and Robert, became seriously ill.
The scarcity of case law in this State concerning pollution of subterranean waters from surface materials dictates some discussion of the law before proceeding to the evidence. In Dillon v Acme Oil Co. (49 Hun 565), the defendant operated a refinery in close proximity to plaintiffs well, and it was shown that the soil around the refinery had become impregnated with oil which seeped into subterranean water, polluting plaintiffs well. The court found as a fact that the defendant’s refinery was constructed and operated as properly as such facilities could be, having reference to the location and nature of the business, and considered whether under these circumstances recovery could be had. The court drew a distinction between surface and subterranean waters saying (p 569): "It is only in exceptional cases that the channels of subterranean streams are known and their courses defined; it is only in such exceptional cases that the owner can know beforehand that his works will affect his neighbor’s wells or supply of water, and we are, therefore, of the opinion that in the absence of negligence and of knowledge as to the existence of such subterranean water-courses, when the business is legitimate and conducted with care and skill, there can be no liability if such subterranean courses become contaminated.”
In a more recent case, Phillips v Sun Oil Co. (307 NY 328), plaintiff sued for trespass, arising out of the pollution of his well from a gasoline storage facility. It was not shown that plaintiff had acted negligently or that the defendant knew or had been put on notice that gasoline was escaping from its *681 underground tank. The court stated (p 331): "even when the polluting material has been deliberately put onto, or into, defendant’s land, he is not liable for his neighbor’s damage therefrom, unless he [defendant] had good reason to know or expect that subterranean and other conditions were such that there would be passage from defendant’s to plaintiffs land (Dillon v. Acme Oil Co., 49 Hun 565; Elsey v. Adirondack & St. Lawrence R.R. Co., 97 Misc. 273; Thompson v. Board of Educ., 124 Misc. 840).”
The Phillips case, however, left open the question of whether negligence by the defendant in the same situation would give rise to liability. In Elsey v Adirondack & St. Lawrence R. R. Co. (97 Misc 273) tailings from a pyrites mill were left upon the ground by defendant resulting in pollution of plaintiffs well because of seepage into the soil. The court stated (pp 276-277): "If defendant did not know the composition of tailings, it could have learned by procuring an analysis. That would have furnished information that the ingredients would certainly pollute the spring, if they reached it. And, with the spring located as it is, defendant is chargeable with the knowledge that they would be likely to reach it, either by way of a subterranean stream or by soaking into and through the ground.”
The court distinguished Dillon v Acme Oil Co. (49 Hun 565, supra) on the theory that in that case no negligence had been shown, and appears to retreat from the distinction previously made between surface and subterranean waters.
The theory of the present case is negligence. The Elsey case indicates that a defendant who fails to exercise due care by leaving noxious materials upon his land, may render himself liable to his neighbor whose water becomes polluted. Theoretically, since an act or omission can only be characterized as negligent with regard to some foreseeable risk of injury, the necessary elements of liability stressed in Dillon and Phillips are subsumed under a negligence theory. This was implicit in Dillon wherein the court’s finding of no liability was predicated upon the defendant’s use of his property in a reasonable manner. Moreover, both Dillon and Phillips indicate that even absent negligence there may be liability for pollution of subterranean waters under trespass or nuisance theories, so long as notice and foreseeability are present. We conclude that for liability to ensue in the present case, claimants must demonstrate that the State failed to exercise due *682 care and knew, or should have known, that its conduct could result in the contamination of claimants’ well.
The material facts relative to the issue of negligence are that in May, 1971 the Department of Transportation sent a memorandum to all regional directors entitled "Minimum Requirements for Salt Storage”, which indicated clearly the State’s awareness of the potential pollution-causing effect of maintaining large stockpiles of rock salt. The memorandum directed that salt be covered by tarpaulins or in some other manner, that it be kept on "pads” composed of some nonporous material, that the pad site be well drained and located away from wells and streams, and that ditches, curbs or tile be installed around the circumference of the storage area to divert runoff to a sump so located as to minimize the effect of salt water leaching. Notwithstanding these explicit directives, the conditions at the Shirley Yard did not comply with the minimum standards set by the Department of Transportation. In particular, piles of salt were left uncovered, and were not stored on pads which complied with the department’s specifications. It was also shown that a residue of salt was left on the ground when salt was delivered to the yard and that no ditches, curbs or tile were installed to divert surface runoff. Under these circumstances, the court concludes that the State was negligent in failing to operate in accordance with its own standards with relation to a recognized and entirely foreseeable risk of harm.
The next link in the causal chain which claimants were obliged to prove was that the negligent operation of the Shirley Yard caused salt water to enter into the ground and contaminate the well on their property. Tests made by the Suffolk County Department of Health Services in 1975, 1976 and 1977 indicated abnormally high levels of sodium and chlorides in the well. Claimants adduced expert testimony on the issue of causation from Nicholas J. Bartilucci, a licensed professional engineer, who was employed at the time of trial as the Water Commissioner of the Jericho Water District. He testified that underground water generally flows in a north-south direction in the Shirley-Mastic area, and that the Meehans’ house is approximately 700 feet south and somewhat east of the storage shed. The witness testified that if salt were not properly covered, rain would dissolve it into the soil forming a "plume” of salt water which would run in the general direction of the underground flow, although it could *683 be diverted if it encountered a subsurface impervious layer. He stated that sumps which accumulate salts from roadway runoff can be a source of salt pollution, as can cesspools, though normal cesspools would be unlikely to produce such a high concentration of chlorides. It was not demonstrated, however, that any sumps or cesspools existed in the immediate area of the Meehan well. It was his opinion that salt from the Shirley Yard was the competent producing cause of the excessive chloride and sodium levels in the Meehans’ well, and the State offered no expert testimony in contradiction.
The court is cognizant of the practical difficulties involved in tracing the subterranean flow of relatively narrow bands of salt water. The proof in this case, as in the majority of similar cases, is largely circumstantial. Various factors have been relied upon by the courts in making a finding of causation or the lack of it. In Elsey v Adirondack & St. Lawrence R. R. Co. (97 Misc 273, supra), the issue was whether refuse from a pyrites mill located approximately one mile from plaintiff’s home was the source of aluminum hydroxide which found its way into plaintiff’s spring. It was shown that the same materials which were present in the industrial refuse were present in plaintiff’s water and that prior to the commencement of industrial operations by the defendant, the water had always been clear and clean. Upon such evidence, the court found that the industrial plant was the source of the pollution and reasoned that the contaminant had leached into the soil and traveled underground, since there was no above ground connecting stream. In Haveman v Buelow (36 Wn 2d 185), it was shown that pollution from defendant’s sump contaminated the plaintiff’s well. The court relied in particular on the porous nature of the local soil, the slope of the land in the area, the flow of subterranean waters in the direction of plaintiff’s property and the condition of neighboring wells. In that case it was also shown that the well water had been potable prior to the digging of the sump, and that it became impure a short time thereafter. Conversely, in Joldersma v Muskegon Dev. Co. (286 Mich 520), it was held that plaintiffs failed to produce sufficient evidence to justify a finding that salt polluting their wells was due to a subterranean flow of percolating waters containing salt from defendant’s sump, where the testimony revealed that several oil wells in the immediate vicinity produced some salt water which was allowed to seep into the earth. (See Ann. 38 ALR2d 1265.)
*684 In the present case, the operation of the Shirley Yard predated the Meehans’ arrival in Mastic. The tests performed in August, 1975 established high sodium and chloride levels as of that date, but there is no way of knowing how long the condition had previously existed. On the other hand, a factor present in Joldersma v Muskegon Dev. Co. (supra) — the existence of other sources of pollution, was not present here. There was no evidence that any sumps, cesspools or other sources of salt were situated in the area.
As the court stated in Matter of Erin Wine & Liq. Store v O’Connell (283 App Div 443, 446, affd 307 NY 768, quoting 32 CJS, Evidence, § 1021 [b], pp 1053-1054): "’A conclusion of fact may be legitimately drawn from a preponderance of probabilities in its favor; conversely, the existence of a fact is not established by evidence which does not render its existence more likely than its nonexistence.’”
When reduced to elementáis, the evidence in this case consists of five facts: (1) the existence of large quantities of salt in close proximity to claimants’ well, (2) a method of storage which allowed salt to dissolve into the soil, (3) the absence of other sources of salt, (4) a general flow of subterranean waters in the direction of claimants’ property relative to the Shirley Yard, and (5) the presence of high sodium and chloride levels in the well.
We are persuaded from these facts that a preponderance of probabilities exists in favor of the proposition that the salt which entered claimants’ well originated in the State’s salt storage facility. This conclusion flows naturally from the facts and is supported by the uncontradicted testimony of claimants’ expert.
The remaining issue is whether the high levels of sodium and chlorides present in the well caused personal injury to Nicole and Robert Meehan. Nicole was born in March, 1972. At that time her family was living in Sayville, New York. At birth she suffered from a malrotation of the digestive system which was evidenced by an inability to retain fluids and diarrhea. These symptoms disappeared after three or four months, according to her mother, Sharon. In February, 1973, the Meehan family moved into their present house in Mastic, New York. At this time Nicole was healthy and was eating a normal diet. Sharon Meehan testified that after living in the new house for two months, Nicole started to lose weight, had *685 diarrhea, was lethargic and was not retaining fluids. During this time, the Meehans were using well water. Nicole’s symptoms became progressively worse between May, 1973 and August, 1974, despite the efforts of six different physicians and hospital stays at Booth Memorial Hospital, Southside Hospital and Good Samaritan Hospital. Nicole’s symptoms improved temporarily during her hospital stays, but they returned when she was discharged, with the exception of her last stay at Good Samaritan Hospital after which a pediatrician prescribed for her a diet which did not utilize well water. Nicole prospered on this diet for almost a year after which Mrs. Meehan took her off the diet because she felt that it was the well water which was causing the problem. She thereafter gave Nicole bottled water.
Meanwhile, on September 11, 1974, Robert Meehan was born. As a baby, Robert was fed a preprepared concentrate which was mixed with the well water. Soon Robert became afflicted with diarrhea, vomiting, rashes and a respiratory infection. As with Nicole, Robert visited a number of doctors and was treated in various hospitals where he made temporary recoveries but became ill upon his return home. The Meehans were advised by Dr. Richard Hill, one of Robert’s physicians, to have their well water tested in April or May of 1975. Mrs. Meehan contacted the Suffolk County Department of Health Services in May of 1975 and again in July of that same year. In August, the first test results were received which indicated chloride concentrations of 440 milligrams per liter and 500 milligrams per liter on the June and July test dates, respectively. Both these figures were in excess of recommended standards. Upon learning this information, Mrs. Meehan ceased using the well water for drinking and cooking and began importing her water from her mother-in-law and buying bottled water. According to Mrs. Meehan, Robert’s symptoms disappeared and both Robert and Nicole have remained healthy. Additional tests were made in 1976 and 1977 also indicating high levels of chlorides and sodium. A communication received from the County of Suffolk Department of Health Services, dated February 26, 1976, states in relevant part:
"The results indicate at the time of sampling, concentrations of chlorides, iron, and manganese were found in excess of the State Sanitary Code standards. Iron and manganese are both naturally occurring ground water constituents in Suffolk *686 County, and. their presence is not normally considered to represent a hazard to health.
"The results also indicate a concentration of 340 mg/1 of chlorides. This concentration is still in excess of the State Standard of 250 mg/1.
"Further, our records indicate that along with the high chloride concentration, a high sodium concentration was encountered. Although the State Sanitary Code sets no specific limit for sodium”.
The issue is whether the level of chlorides and sodium in the well water caused the symptoms manifested by the children. This was the subject of conflicting expert testimony.
The State’s medical expert, Dr. Harvey Myers, testified categorically that "salt-sodium-chloride” in the Meehans’ well was not the competent producing cause of the symptoms. The reasons he gave were the following: (1) the blood analysis of each child, performed in the hospital, indicated normal levels of these chemicals; (2) Nicole’s diagnosis at the hospital was viral gastroenteritis; (3) Robert’s diagnosis at the hospital was pathogenic E Coli infection; and (4) the Health Department’s tests showed only slightly higher than acceptable amounts of chlorides, and that this amount is insufficient to produce gastrointestinal disturbances. He stated that 400 milligrams is approximately Vath of a teaspoon, and 440 to 500 milligrams per liter of chlorides in water is not dangerous to a healthy person and would not cause gastrointestinal symptoms in even a highly susceptible child of seven months. He stated that the amount of salt necessary to cause a laxative effect would make the water totally unpalatable.
By contrast, the expert testimony given by claimants’ medical expert, Dr. Hill, was equivocal to a high degree. He stated merely that salt could produce the symptoms exhibited by the children, but was unwilling to state that salt was the competent producing cause of their illnesses. He indicated that if sodium chloride was the causal agent involved, one would expect to find high concentrations of these chemicals in the blood, which, as previously indicated, were not present. He was similarly unable to state that 440 to 500 milligrams per liter of chloride would necessarily cause high chloride concentration in the blood.
The case is not unlike Yaggle v Allen (24 App Div 594), in which plaintiffs decedent expired under chloroform anesthesia during an operation on his shoulder and it was contended *687 that the anesthesia had been administered improperly. After an autopsy, the attending physician, who testified at trial for the defendants, rendered a diagnosis of death from calcareous degeneration of the heart. Plaintiff’s expert testified (p 596) merely that decedent " 'died during chloroform anaesthesia; that is all I can say; I couldn’t say what was the cause of death.’ ” Reversing a jury verdict in plaintiffs favor, the court said (pp 598-599):
"This is not a case of conflicting expert testimony, where upon one side the doctors swear that the death was caused by suffocation produced by the use of chloroform, and, on the other side, the doctors swear that the death was caused by calcareous degeneration of the heart, and where possibly it would be left to the jury to determine, from the manner in which they gave their evidence, and from the reasons upon which they based their opinions, as to who were correct; but it is a case where some of the doctors cannot tell what was the cause of death, and others testify that it was not caused by the use of chloroform, but was caused by this calcareous degeneration of the heart.
"Considering the evidence of these physicians in the view that is most favorable to the plaintiff, the most that can be said is, that it is doubtful what caused the death of the deceased.”
The testimony of Dr. Hill was of the same character as that given in Yaggle v Allen (supra). We are not persuaded by it that high levels of sodium and chloride caused the children’s medical problems.
The circumstantial evidence provided by Mrs. Meehan’s testimony to the effect that the children’s symptoms began when they drank the water and disappeared when they ceased doing so, is similarly unpersuasive. Nicole Meehan exhibited the same symptoms of diarrhea, vomiting and dehydration prior to the family’s moving to Mastic. She was diagnosed as having a malrotation of the intestines at birth, which diagnosis was reconfirmed in August, 1974 at Good Samaritan Hospital. This strongly suggests that Nicole’s ailment was not caused, at least initially, by anything in the Meehans’ well. In Robert’s case, the diagnosis of pathogenic E Coli was the result of a laboratory test which established the existence of this bacterium. Claimants offered no testimony or other evidence tending to disprove the validity of this diagnosis. Moreover, even assuming that the children’s symptoms ceased *688 when use of the well water was discontinued, it was claimants’ burden to prove by a preponderance of the evidence that salt was the ingredient causing the trouble.
In Karr v Inecto, Inc. (247 NY 360) the issue was whether a hair dye which plaintiff, a beautician, had used on a customer was the cause of an infection on plaintiff’s finger which appeared 12 hours later. The customer suffered no adverse effects, concerning which fact the court said (pp 363-364): "The dye had been applied to the hair and scalp of the customer * * * Apparently it had not injured her, yet without other evidence that the dye contained a chemical poison or irritant we are asked to assume that this so-called 'chemical product,’ admittedly harmless to the customer, was dangerous and poisonous and caused injury to the plaintiff. Possibly some individuals may possess a peculiar immunity against the effects of a particular chemical poison or irritant; possibly other individuals possess a peculiar susceptibility. We know only that even if the dye used may possibly be a competent producing cause of a morbid condition such as developed on plaintiff’s finger, it does not always produce such a result, otherwise the customer would not have escaped injury. All else rests purely on conjecture.”
The court in Karr went on to say that absent a showing that some chemical in the dye could produce the symptoms exhibited by plaintiff, there was insufficient evidence of causation notwithstanding the temporal proximity of the dye’s use and the injury. The present case is closely analogous since the medical testimony persuades us that the quantity of salt in the Meehans’ well was insufficient to produce the children’s symptoms. Consequently, the fact that the children recovered after ceasing to drink well water does not establish a sufficient causal link between the State’s negligence and their injury. We note further that both Sharon and Daniel Meehan also drank well water without ill effects. We can conceive that young infants might be more susceptible to contaminants than adults. However, if a "peculiar susceptibility” was indeed responsible for the children’s illnesses, it is equally possible that they were overly sensitive to normally harmless amounts of iron and manganese which were also found in the well, and which were unrelated to any acts or omissions by the State.
While a remote possibility exists that the salt did adversely affect the children, mere proof of possibility is insufficient to establish a fact by a preponderance of the evidence. *689 (Matter of Erin Wine & Liq. Store v O’Connell, 283 App Div 443, 446, affd 307 NY 768, supra.) We are of the opinion that, as in Karr v Inecto, Inc. (supra) the Meehan claim for personal injuries is highly conjectural.
Accordingly, this claim is dismissed.