IN THE SUPREME COURT OF TEXAS
 
════════════
No. 
08-1066
════════════
 
Michael T. Jelinek, M.D. and Columbia Rio Grande Healthcare, L.P. d/b/a 
Rio Grande Regional Hospital, Petitioners,
 
v.
 
Francisco Casas and Alfredo DeLeon, Jr., as 
Personal Representatives of the Estate of Eloisa Casas, Deceased, Respondents
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the 
Thirteenth District of Texas
════════════════════════════════════════════════════
 
 
Argued February 18, 2010
 
 
Justice Guzman delivered the opinion of the Court, in which Justice Hecht, Justice Wainwright, Justice Medina, Justice Johnson, and 
Justice Willett joined, and in 
which Chief Justice Jefferson, Justice 
Green, and Justice Lehrmann 
joined as to Parts I and II.A.
 
            
Chief Justice Jefferson filed an 
opinion, dissenting in part, in which Justice Green and Justice Lehrmann 
joined.
 
            
Justice Lehrmann filed an opinion, 
dissenting in part.
            

            

            
When circumstantial evidence is consistent with several possible medical 
conclusions, only one of which establishes that the defendant’s negligence 
caused the plaintiff’s injury, an expert witness must explain why, based on the 
particular facts of the case, that conclusion is medically superior to the 
others.  If the expert fails to give any reason beyond an unsupported 
opinion, the expert’s testimony is legally insufficient evidence of 
causation.  In this case, we determine whether legally sufficient evidence 
supports the jury’s verdict in favor of the estate of Eloisa Casas[1] against Rio Grande Regional Hospital (the 
Hospital).[2]  Following her admission to the 
Hospital with abdominal pain, doctors placed Casas on 
antibiotics used to treat and prevent certain intra-abdominal infections.  
Two days later she underwent major abdominal surgery and continued on the 
antibiotics for another five days, but the Hospital allowed the prescriptions to 
lapse for four-and-a-half days.  The Hospital admits it should have 
continued the antibiotics but denies that the lapse caused Casas any additional pain.  We hold that the Casases failed to present legally sufficient evidence that 
Casas suffered from an infection the omitted 
antibiotics would have treated.  Accordingly, we reverse the court of 
appeals’ judgment and render judgment that the Casases 
take nothing.[3]
            
In a separate petition, Dr. Michael Jelinek, one of 
Casas’s treating physicians sued by the Casases, argues that the trial court should have granted his 
motion for sanctions and dismissal because the Casases’ expert report was deficient.  We agree and 
hold that an award of attorney’s fees is proper.  Therefore, we reverse and 
remand to the trial court for an award of attorney’s fees and costs.
I.  
Background
            
In 2000, Eloisa Casas was diagnosed with colon cancer 
and underwent surgery, radiation, and chemotherapy.  A year later, doctors 
told her that the cancer appeared to be in remission, and she thought she was 
cured.  But on July 10, 2001, she was admitted to the Hospital with 
abdominal pains; she also had a fever and a mildly elevated white-blood-cell 
count, potentially indicating an infection.  To treat this possible 
infection, her surgeon and primary physician, Dr. Carlos Garcia-Cantu, consulted 
with an infectious disease specialist at the Hospital, Dr. Michael Jelinek, who on July 11 prescribed two medications, Maxipime (a broad-spectrum antibiotic), and Flagyl (an antibiotic used to treat anaerobic 
bacteria).
            
The Hospital performed several diagnostic tests, which revealed abnormal 
collections of fluid in Casas’s abdomen.  On July 
13, she underwent major abdominal surgery during which Dr. Garcia-Cantu 
discovered that “fairly extensive” metastatic cancer had perforated Casas’s colon and allowed material to leak into her 
abdominal cavity, causing an intra-abdominal abscess.  Dr. Garcia-Cantu 
drained the abscess, repaired Casas’s colon, and 
inserted a Jackson-Pratt drain to prevent further problems.  Following the 
surgery, Dr. Garcia-Cantu continued the Maxipime and 
Flagyl prescriptions, and a culture of the removed 
abscess revealed an E. coli infection, which is effectively treated with Maxipime.  Casas received 
Maxipime and Flagyl for 
another five days, but hospital staff inadvertently failed to place a 
prescription renewal form on Casas’s chart, resulting 
in a four-and-a-half-day period between July 18 and 23 during which Casas did not receive either medication.  Even so, 
Casas never tested positive for E. coli again and a 
culture of the incision site on July 18 instead grew Candida (a fungus) for 
which Diflucan (an antifungal) was prescribed.  
Then, on July 21, a second culture from a blood sample grew coagulase-negative staph, for which Vancomycin was prescribed.[4]  Neither Maxipime nor Flagyl would have 
treated the Candida or coagulase-negative staph 
infection.
            
On July 23, Dr. Garcia-Cantu noted an abscess in the wound, which he drained by 
removing the staples and opening the wound.  The next day, records indicate 
that a foul smell was emanating from the wound site, and hospital staff brought 
fans into the room to dissipate the odor.  When Dr. Jelinek learned of the lapsed prescription on July 23, he 
informed Casas and then prescribed different 
antibiotics, Levaquin and Vancomycin.  On July 25, after a CAT scan showed no 
abscess, Dr. Garcia-Cantu removed the drain.  Casas left the Hospital on August 23, but she returned in 
early September and died two months later.
            
In May 2003, several members of Casas’s family, 
including her husband and son, filed suit against the Hospital, Dr. 
Garcia-Cantu, and Dr. Jelinek.  The plaintiffs 
claimed that the defendants’ negligence caused Eloisa Casas to “suffer grievous embarrassment and humiliation, as 
well as excruciating pain the remainder of her life which she would not have 
suffered to such degree or extent if properly diagnosed, treated and cared 
for.”  The plaintiffs sought to recover damages for Casas’s injuries and mental anguish.  They twice 
amended their petition, ultimately leaving the Casases 
as the sole plaintiffs.
            
As required by former article 4590i § 13.01 of the Medical Liability and 
Insurance Improvement Act, see Tex. Rev. Civ. Stat. art. 4590i § 13.01,[5] the Casases 
filed an expert report within 180 days of filing the original petition.  In 
the report, Dr. John Daller opined that Dr. 
Garcia-Cantu and Dr. Jelinek were negligent in failing 
to discover that the antibiotics were not being given to Casas and that within “reasonable medical probability” this 
negligence resulted in a prolonged hospital stay and increased pain and 
suffering.  Dr. Jelinek later filed a motion for 
sanctions and dismissal under article 4590i § 13.01(e), alleging that the 
expert report was deficient because, among other things, it failed to explain 
any causal connection between the negligence and the purported injury.  The 
trial court denied the motion.  Before trial began, however, the Casases nonsuited Dr. Jelinek and Dr. Garcia-Cantu.
            
At trial, Dr. Daller testified as the Casases’ medical expert.  During direct examination, he 
analyzed the Hospital’s daily patient notes regarding Casas and identified the significant events.  He noted 
changes in Casas’s vital signs on July 21 and 22, such 
as increased heart rate and temperature, inflammation, and tenderness of the 
surgery site.  Dr. Daller stated that “in medical 
probability” there was an infection in the abdomen, but on cross-examination he 
admitted that “there was no objective evidence present to demonstrate that 
intra-abdominal infection.”  When reviewing the patient notes for July 24, 
which noted the presence of a foul smell, he suggested that the smell was 
consistent with an anaerobic infection that would be difficult to culture 
because anaerobic bacteria die when exposed to air.  Dr. Carl Berkowitz, 
the Hospital’s expert, offered several other explanations for the smell, such as 
the Candida infection or dying tissue.
            
The Casases also called Casas’s relatives to testify about her condition.  
Consistent with Dr. Daller’s testimony, Casas’s son linked the smell with the opening of the wound 
to drain the abscess: “The odor that I noticed was after they had taken out the 
staples on her incision, and one day that I went to see her as soon as they 
opened the door the whiff of this putrid smell just engulfed me.”  He also 
testified that Casas was upset upon learning that she 
had not received the antibiotics but was even more upset when the incision had 
to be opened and drained: “Well, after she was told and I was told that she 
wasn’t getting antibiotics, like I said, she was upset.  What really upset 
her more was when they had to—they had to take out the staples out of her 
incision, and they had to open her incision up again.”   Casas’s husband testified that, while she was upset and did 
not trust the nurses or doctors after learning of the lapsed prescription, “she 
was still fighting.  She . . . wanted to beat this cancer she had.”  
The son testified that Casas did not lose hope until 
she witnessed the events of September 11, 2001, following her re-admission to 
the Hospital: “That’s why I remember that day so vividly in my mind because that 
was the turning point in my mom.  She seemed to just give up, not fight, 
not want to fight anymore like she used to.  And that was a very, very sad 
day.”
            
The jury found that the negligence of the Hospital, Dr. Jelinek, and Dr. Garcia-Cantu proximately caused Casas’s injury.  The jury apportioned ninety percent of 
the negligence to the Hospital, five percent to Dr. Jelinek, and five percent to Dr. Garcia-Cantu.  It 
awarded $250,000 in damages to the Casases as 
compensation for Casas’s pain and mental 
anguish.
            
The Hospital appealed, arguing that the evidence was legally and factually 
insufficient to prove causation or damages for mental anguish.  Dr. Jelinek also appealed, challenging the trial court’s denial 
of his motion for sanctions and dismissal.  The court of appeals affirmed 
on all issues.  __ S.W.3d __.    

II. Analysis
            
We address in turn the two issues raised in this appeal:  the legal 
sufficiency of the causation evidence and the sufficiency of the Casases’ expert report.
            
A.        Sufficiency of the 
Evidence
            
The facts of this case are unfortunate: a woman with advanced colon cancer 
underwent surgery to repair her cancer-perforated and infected colon, and in the 
course of treatment for her many symptoms the Hospital failed to renew her 
antibiotic prescriptions for a four-and-a-half-day period.  The Hospital 
admits it should have continued the antibiotics.  Even so, the plaintiff 
bears the burden to prove that the negligence caused an injury: “[A]t trial the 
plaintiff must establish two causal nexuses in order to be entitled to recovery: 
(a) a causal nexus between the defendant’s conduct and the event sued upon; and 
(b) a causal nexus between the event sued upon and the plaintiff’s 
injuries.”  Morgan v. Compugraphic Corp., 675 S.W.2d 729, 731 (Tex. 
1984).  Only the second nexus is at issue here.
            
In City of Keller v. Wilson, we considered at length the parameters of 
legal sufficiency review, quoting with approval Chief Justice Calvert’s seminal 
article on the topic:
“No evidence” points must, and may only, be sustained 
when the record discloses one of the following situations: (a) a complete 
absence of evidence of a vital fact; (b) the court is barred by rules of law or 
of evidence from giving weight to the only evidence offered to prove a vital 
fact; (c) the evidence offered to prove a vital fact is no more than a mere 
scintilla; (d) the evidence establishes conclusively the opposite of the vital 
fact.
 
168 S.W.3d 802, 810 
(Tex. 2005) (quoting Robert W. Calvert, “No Evidence” and “Insufficient 
Evidence” Points of Error, 38 Tex. L. Rev. 361, 362–63 
(1960)).  “When the evidence offered to 
prove a vital fact is so weak as to do no more than create a mere surmise or 
suspicion of its existence, the evidence is no more than a scintilla and, in 
legal effect, is no evidence.”  Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).  
The same is true when the evidence equally supports two alternatives: “‘When the circumstances are equally consistent with either of 
two facts, neither fact may be inferred.’”  City of 
Keller, 168 S.W.3d at 813 (quoting Tubelite, a Div. of Indal, Inc. v. Risica & Sons, 
Inc., 819 S.W.2d 801, 805 (Tex. 1991)).  When considering such 
cases, “we must ‘view each piece of circumstantial evidence, not in isolation, 
but in light of all the known circumstances,’” id. at 813–14 (quoting Lozano v. Lozano, 52 S.W.3d 141, 
167 (Tex. 2001) (per curiam)), and we “must consider 
not just favorable but all the circumstantial evidence, and competing inferences 
as well.”  Id. at 
814.
            
To meet the legal sufficiency standard in medical malpractice cases “plaintiffs 
are required to adduce evidence of a ‘reasonable medical probability’ or 
‘reasonable probability’ that their injuries were caused by the negligence of 
one or more defendants, meaning simply that it is ‘more likely than not’ that 
the ultimate harm or condition resulted from such negligence.”  Kramer v. Lewisville Mem’l Hosp., 
858 S.W.2d 397, 399–400 (Tex. 1993) (citations omitted).  Thus, we 
examine the record to determine if the Casases 
presented legally sufficient evidence that “in reasonable medical probability” 
the Hospital’s negligence caused Casas additional pain 
and suffering.
            
When distilled to its essence, the Casases’ claim is 
predicated on the presence of an infection—treatable by the lapsed 
antibiotics—that caused Casas pain and mental anguish 
above and beyond that caused by the cancer, the surgery, and the other known 
infections.  The absence of an infection treatable by Maxipime and Flagyl would 
undermine the Casases’ claim, for then the 
prescription lapse would amount to an unfortunate, but harmless, 
occurrence.  The Hospital argues that the Casases 
presented no evidence that the Hospital’s negligence caused such an 
infection.  The Casases’ expert admitted there is 
no direct evidence of an anaerobic infection, leaving the jury to consider the 
circumstantial evidence and make proper inferences from it.  In reviewing 
the record, we initially decide if jurors can determine causation under these 
facts unaided by expert testimony—that is, whether lay testimony regarding 
causation is legally sufficient.
                        
1.         Lay Testimony of 
Causation
            
Lay testimony may be used as evidence of causation in certain circumstances, but 
“[w]hen expert testimony is required, lay evidence supporting liability is 
legally insufficient.”  City of Keller, 168 S.W.3d 
at 812.  In medical malpractice cases, expert testimony regarding 
causation is the norm: “The general rule has long been that expert testimony is 
necessary to establish causation as to medical conditions outside the common 
knowledge and experience of jurors.”  Guevara v. Ferrer, 247 S.W.3d 662, 665 (Tex. 2007); see also 
Bowles v. Bourdon, 219 S.W.2d 779, 782 (Tex. 1949) (“It is definitely 
settled with us that a patient has no cause of action against his doctor for 
malpractice, either in diagnosis or recognized treatment, unless he proves by a 
doctor of the same school of practice as the defendant: (1) that the diagnosis 
or treatment complained of was such as to constitute negligence and (2) that it 
was a proximate cause of the patient’s injuries.”).  We have allowed lay 
evidence to establish causation “in those cases in which general experience and 
common sense will enable a layman to determine, with reasonable probability, the 
causal relationship between the event and the condition.”  Morgan, 
675 S.W.2d at 733 (citing Lenger v. 
Physician’s Gen. Hosp., Inc., 455 S.W.2d 703, 706 (Tex. 1970)).  Care 
must be taken to avoid the post hoc ergo propter hoc fallacy, that is, finding an earlier event caused a later 
event merely because it occurred first.  Stated simply, correlation does 
not necessarily imply causation.  As we noted in 
Guevara, “[e]vidence of an event followed 
closely by manifestation of or treatment for conditions which did not appear 
before the event raises suspicion that the event at issue caused the 
conditions.  But suspicion has not been and is not legally 
sufficient to support a finding of legal causation.”  247 
S.W.3d at 668.  
            
When lay testimony is credited as evidence of causation, it usually highlights a 
connection between two events that is apparent to a casual observer.  In 
Morgan, for example, a previously healthy employee, upon exposure to 
leaking chemicals, suffered watering of the eyes, blurred vision, headaches, and 
swelling of the breathing passages.  675 S.W.2d at 
733.  In such a circumstance, lay testimony sufficed to connect the 
specific injury to the negligence with no evidence of causation beyond the 
leaking chemicals.  Id.  Likewise in Guevara, we stated 
that determining causation of “certain types of pain, bone fractures, and 
similar basic conditions” following an automobile accident was within the 
competence of lay jurors.  247 S.W.3d at 
668.  But we held that expert testimony was required to prove that a 
patient’s medical expenses resulted from the accident, noting that “[p]atients in hospitals are often treated for more than one 
condition brought on by causes independent of each other.”  Id. at 669.  These cases illustrate this basic 
premise: “[N]on-expert evidence alone is sufficient to support a finding of 
causation in limited circumstances where both the occurrence and conditions 
complained of are such that the general experience and common sense of 
laypersons are sufficient to evaluate the conditions and whether they were 
probably caused by the occurrence.”  Id. at 
668.
            
The present case does not fall within this rule.  Unlike in Morgan, 
an otherwise healthy person did not suddenly experience health difficulties 
following the defendant’s negligent conduct when the plaintiff’s symptoms were 
reasonably attributable to the negligence and to nothing else.  Rather, a 
patient with terminal colon cancer did not receive antibiotics for 
four-and-a-half days following major abdominal surgery and after having received 
the medications for eight days.  There is no direct evidence that she 
suffered from an infection treatable by the omitted antibiotics, but there is 
evidence that she had two other infections that accounted for all of her 
symptoms during that time.  Given Casas’s medical 
condition, expert testimony was crucial to link the prescription lapse to an 
infection causing additional pain and suffering beyond what she would otherwise 
have experienced.  See Kaster v. Woodson, 
123 S.W.2d 981, 983 (Tex. Civ. App.—Austin 1938, writ ref’d) (“What is an infection and from whence did it come 
are matters determinable only by medical experts.”); see also Hart v. Van 
Zandt, 399 S.W.2d 791, 792 (Tex. 1966) (“In determining negligence in a case 
such as this, which concerns the highly specialized art of treating disease, the 
court and jury must be dependent on expert testimony.  There can be no 
other guide, and where want of skill and attention is not thus shown by expert 
evidence applied to the facts, there is no evidence of it proper to be submitted 
to the jury.”).
            
The Casases point to testimony by Casas’s husband and son to support their argument that she 
deteriorated rapidly after discovering she did not receive the 
antibiotics.  But this characterization overstates the evidence.  
While Casas’s husband testified she was upset and did 
not trust her doctors following the discovery, she was still determined to fight 
her cancer.  The son also observed Casas’s anger 
and lack of trust but testified that the opening of her wound, which occurred 
the same day she learned of the lapse, upset her even more.  As Dr. Daller admitted, Candida likely caused the abscess that 
required Dr. Garcia-Cantu to drain the wound.  Further, based on his 
experience at Casas’s bedside, her son pinpointed the 
tragic events of September 11, 2001, and their effect on his mother as the 
turning point in her mental state.  The latter event was some seven weeks 
after discovery of the lapsed prescriptions and after Casas’s discharge from and re-admission to the 
Hospital.  This evidence does not bear out the Casases’ claim of a marked shift in Casas’s mental resilience following the omission of the 
medications.
            
More importantly, Casas’s husband and son were unable 
to precisely identify the cause of her suffering.  While they could 
accurately describe her discomfort, they were unable to say if it was the 
cancer, the surgery, the other infections, or the lapse that caused it.  
Even testimony that Casas suffered after learning of 
the omission raises no more than a mere suspicion of causation, and that is not 
enough, see Guevara, 247 S.W.3d at 668, particularly in light of the 
evidence that Casas thought she was cured of cancer 
before the surgery and then learned that not only was it “back with a 
vengeance,” it was terminal.  The testimony of Casas’s husband and son is evidence of her suffering, but 
not of its cause.  Thus, we hold that the lay testimony presented by the 
Casases is legally insufficient to establish that the 
Hospital’s negligence caused Casas additional pain and 
suffering.
                        
2.         Expert 
Testimony
            
The Casases also presented expert testimony regarding 
causation.  The Casases’ expert, Dr. Daller, testified that the Hospital’s negligence “in medical 
probability” caused Casas additional pain and 
suffering.  He based this opinion on the presence of an intra-abdominal 
infection that could have been treated using Maxipime 
and Flagyl.  Admitting that no direct evidence 
indicated such an infection, Dr. Daller pointed to 
various circumstantial indicators that suggested an infection.  These 
indicators were primarily Casas’s changed vital signs, 
such as fever and increased heart rate: “Well, given the fact that two to three days after the antibiotics had been mistakingly [sic] stopped her fever curve went up and her 
heart rate went up, to me that suggests the presence of on 
going [sic] infection.”[6]  But on cross-examination, he 
conceded these data were equally consistent with two other infections cultured 
from Casas’s incision and blood—Candida and coagulase-negative staph—neither of which is treatable by 
Maxipime or Flagyl:
            
Q. Now, Candida, infection of a wound like this, they can cause high 
temperatures.  Correct?
                                    

            
A.  Fungal infections can cause a high temperature, yes.
 
            
Q.  It can cause increased heart rate?
 
            
A.  That is correct.
 
            
Q.  And inflammation?
 
            
A.  That is correct.
 
            
Q.  Pain?
 
            
A.  That is correct.
 
            
Q.  How about an abscess?
 
            
A.  It caused or is part of the abscess in that wound that was present, that wound infection that needed to be 
opened.
 
            
Q.  So when Doctor Garcia went in on 7/23 . . . and drained that wound at 
bedside that abscess was within a reasonable degree of medical probability 
caused by the Candida?
 
            
A.  That was one of the organisms that was 
there.  It was the organism that was cultured.  That is 
correct.
 
            
. . . .
 
            
Q.  . . . This coagulase negative staph causes 
fever?
 
            
A.  Correct.
 
            
Q.  Increased heart rate?
 
            
A.  The fever will cause increased heart rate.
 
            
. . . . 
 
            
Q.  It can cause pain?
            
A.  Depending upon the site.  Correct.
 
            
Q.  Okay.  All of these things can be caused by coagulase negative staph and Candida, which we know were 
present 7/18 through 7/23, the time period she did not get 
antibiotics?
 
            
A.  That’s correct.
 
            
Q.  Neither one would have been killed by Maxipime or Flagyl?
 
            
A.  That’s correct.
 
            
It is not enough for an expert simply to opine that the defendant’s negligence 
caused the plaintiff’s injury.  The expert must also, to a reasonable 
degree of medical probability, explain how and why the negligence caused the 
injury.  We have rejected expert opinions not grounded in a sound 
evidentiary basis: “[I]f no basis for the opinion is offered, or the basis 
offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative 
evidence, regardless of whether there is no objection.  ‘[A] claim will not 
stand or fall on the mere ipse dixit of a credentialed witness.’”  
City of San Antonio v. Pollock, 284 S.W.3d 809, 818 (Tex. 2009) (quoting 
Burrow v. Arce, 997 S.W.2d 229, 235 (Tex. 
1999)); see also Whirlpool Corp. v. Camacho, 298 S.W.3d 631, 637 (Tex. 
2009) (“Conclusory or speculative opinion testimony is 
not relevant evidence because it does not tend to make the existence of material 
facts more probable or less probable.”).  When the only evidence of a vital 
fact is circumstantial, the expert cannot merely draw possible inferences from 
the evidence and state that “in medical probability” the injury was caused by 
the defendant’s negligence.  The expert must explain why the inferences 
drawn are medically preferable to competing inferences that are equally 
consistent with the known facts.  Thus, when the facts support several 
possible conclusions, only some of which establish that the defendant’s 
negligence caused the plaintiff’s injury, the expert must explain to the fact 
finder why those conclusions are superior based on verifiable medical evidence, 
not simply the expert’s opinion.  See Lenger, 455 S.W.2d at 707 (“[E]xpert testimony that the event is a possible cause of the 
condition cannot ordinarily be treated as evidence of reasonable medical 
probability except when, in the absence of other reasonable causal explanations, 
it becomes more likely than not that the condition did result from the event.”); 
Hart, 399 S.W.2d at 792 (“The burden of proof is on the plaintiff to show 
that the injury was negligently caused by the defendant and it is not enough to 
show the injury together with the expert opinion that it might have occurred 
from the doctor’s negligence and from other causes not the fault of the 
doctor.  Such evidence has no tendency to show that negligence did cause 
the injury.”).
            
By conceding that Casas’s symptoms were consistent 
with infections not treatable by Maxipime or Flagyl, Dr. Daller undermined his 
conclusion that an undetected infection was also present.  While it is 
possible that Casas did have such an infection, its 
presence can only be inferred from facts that are equally consistent with the 
Candida and coagulase-negative staph infections.  
“‘When the circumstances are equally consistent with either of two facts, 
neither fact may be inferred.’”  City of 
Keller, 168 S.W.3d at 813 (quoting Tubelite, 819 S.W.2d at 805).  Here, 
objective data—the cultures—support the Candida and staph infections but not the 
supposed anaerobic infection.[7]
            
Based on the record evidence, an anaerobic infection cannot be proved or 
disproved.  It is equally plausible that Casas 
had such an infection or that she did not.  Dr. Daller opined that she did, but he did not explain why that 
opinion was superior to the opposite view.  Such evidence raises no more 
than a possibility of causation, which is insufficient.  As we said in 
Bowles v. Bourdon, “‘[t]he proof must establish causal connection beyond 
the point of conjecture.  It must show more than a possibility.  
Verdicts must rest upon reasonable certainty of proof.  Where the proof 
discloses that a given result may have occurred by reason of more than one 
proximate cause, and the jury can do no more than guess or speculate as to which 
was, in fact, the efficient cause, the submission of such choice to the jury has 
been consistently condemned by this court and by other courts.’”  219 
S.W.2d at 785 (quoting Ramberg v. 
Morgan, 218 N.W. 492, 498–99 (Iowa 1928)).
            
The Casases argue that the foul smell, which is 
consistent with an anaerobic infection, is strong evidence of such an 
infection.  Looking at the patient notes for July 24, Dr. Daller commented on the smell:
            
A.  The text says something about drainage to the abdomen with moderate 
amount of drainage.  And it says that it is foul 
smelling.
 
            
. . . .
 
            
Q.  The [previous notes] that I remember that we have gone over didn’t say 
anything about foul smelling?
 
            
A.  That’s correct.  They were just described as I recall as being 
purulent and looking like puss [sic].
 
            
Q.  What does that mean when it says “foul smelling”?
 
            
A.  When you have foul smelling, it suggests that the organism is an 
anaerobe.  In other words, one of those bacteria that didn’t need oxygen in 
order to grow that, for example, Flagyl would 
treat.
 
            
Q.  Okay.  Does that give you clinical evidence that had she been 
continued on Maxipime and Flagyl that they would have had some effect with regards to 
the condition as we see it on the 24th?
 
            
A.  Well, like I said, most anaerobes are sensitive or susceptible to Flagyl.  And she had previously been on Flagyl and at this time she is not.  So I would have 
expected that that would be an appropriate antibiotic that would have covered 
the organism that’s causing that foul smell.
 
Dr. Berkowitz, the Hospital’s expert, 
offered several other explanations for the smell, including necrotic tissue, 
dead cancer tissue, and the Candida infection.[8]  As noted, Casas’s son noticed the smell after the incision was opened 
to drain the abscess, which Dr. Daller admitted was 
likely caused by Candida.
            
Here again, there are competing explanations for the smell, which amounts to no 
more than circumstantial evidence of some kind of infection or possibly dying 
tissue.  Because there is no direct evidence of the infection and the 
circumstantial evidence is meager, we “must consider not just favorable but all 
the circumstantial evidence, and competing inferences 
as well.”  City of Keller, 168 S.W.3d at 
814.  Courts should not usurp the jury’s role as fact finder, nor 
should they question the jury’s right to believe one witness over another.  
But when reviewing a verdict for sufficiency of the evidence, courts need 
not—indeed, must not—defer to the jury’s findings when those findings are not 
supported by credible evidence.  When the evidence compels the jury to 
guess if a vital fact exists, a reviewing court does not undermine the jury’s 
role by sustaining a no-evidence challenge.  The evidence in this 
case—being consistent with an anaerobic infection that was treatable by Flagyl, a fungal infection that was not, or even with dying 
tissue, cancerous or otherwise—did not provide the jury a reasoned basis from 
which to infer the presence of a negligence-induced infection.  Because the 
jury could not reasonably infer an infection caused by the Hospital’s 
negligence, we agree with the Hospital that no evidence supports the jury’s 
verdict.
            
We understand the Casas family’s predicament and 
frustration at the Hospital’s conduct, and we recognize the difficulty of 
proving that the lapsed prescriptions caused a painful infection.  But the 
Casases shouldered that burden and must prove the 
causal link with reasonable certainty.  In that quest, the Casases offered the testimony of Dr. Daller, but he did not explain why an undetected, anaerobic 
infection is medically more probable than one based on the known infections and 
the dying tissue, leaving the jury to guess if the lapsed prescriptions caused 
additional pain and suffering.  Without probative medical testimony that 
the lapse caused—by means of an infection treatable by Maxipime and Flagyl—more pain than 
the cancer, the surgery, and the other infections already inflicted, there is no 
legally sufficient evidence of causation.  Dr. Daller did not provide that causal link; accordingly, we 
hold that his testimony is legally insufficient to support the jury’s 
verdict.  Because the Casases failed to prove 
causation, we reverse the judgment of the court of appeals and render judgment 
that the Casases take nothing.
            
B.        Adequacy of the Expert 
Report
            
In his petition, Dr. Jelinek raises a single issue: 
whether the trial court abused its discretion by denying his motion for 
sanctions and dismissal because the Casases’ expert 
report was deficient under former article 4590i § 13.01, the statute in effect 
at the time.  See Tex. Rev. Civ. Stat. 
art. 4590i § 13.01.  Article 
4590i required the report to provide “a fair summary of the expert’s opinions as 
of the date of the report regarding applicable standards of care, the manner in 
which the care rendered by the physician or health care provider failed to meet 
the standards, and the causal relationship between that failure and the injury, 
harm, or damages claimed.”  Id. § 13.01(r)(6).  “If a plaintiff timely files an expert report and 
the defendant moves to dismiss because of the report’s inadequacy, the trial 
court must grant the motion ‘only if it appears to the court, after 
hearing, that the report does not represent a good faith effort to comply 
with the definition of an expert report in Subsection (r)(6) of this section.’” Bowie Mem’l Hosp. v. Wright, 79 S.W.3d 48, 51–52 (Tex. 2002) 
(per curiam) (quoting § 13.01(l)).  Dismissal for 
failure to serve an adequate expert report also carried mandatory sanctions, 
requiring an award to the defendant of his costs and attorney’s fees against the 
plaintiff or the plaintiff’s attorney.  See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 877 
(Tex. 2001) (citing § 
13.01(e)).
            
We have defined a “good-faith effort” as one that provides information 
sufficient to (1) “inform the defendant of the specific conduct the 
plaintiff has called into question,” and (2) “provide a basis for the trial 
court to conclude that the claims have merit.”  Wright, 79 S.W.3d 
at 52 (citing Palacios, 46 S.W.3d at 879).  All information 
needed for this inquiry is found within the four corners of the expert report, 
which need not “marshal all the plaintiff’s proof” but must include the expert’s 
opinion on each of the three main elements: standard of care, breach, and 
causation.  Id.  Importantly for this case, the “report cannot 
merely state the expert’s conclusions about these elements,” but “‘the expert 
must explain the basis of his statements to link his conclusions to the 
facts.’”  Id.  (quoting Earle v. 
Ratliff, 998 S.W.2d 882, 890 (Tex. 1999)).  “A report that merely 
states the expert’s conclusions about the standard of care, breach, and 
causation” does not fulfill the two purposes of a good-faith effort.  
Palacios, 46 S.W.3d at 879.
            
We review the trial court’s grant or denial of a motion for sanctions and 
dismissal under the abuse-of-discretion standard.  Palacios, 46 S.W.3d at 877–78.  A district court “abuses its 
discretion if it acts in an arbitrary or unreasonable manner without reference 
to any guiding rules or principles.”  Wright, 79 S.W.3d at 52 
(citing Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241–42 
(Tex. 1985)).
            
Dr. Jelinek argues that the Casases’ report is deficient in two ways, failing (1) to 
state the applicable standard of care, and (2) to provide more than conclusory statements of causation.  We focus on the 
latter.  Dr. Daller’s report concluded that Dr. 
Jelinek’s breach of the appropriate standard of care 
in “reasonable medical probability, resulted in a prolonged hospital course and 
increased pain and suffering being experienced by Ms. Casas.”  Aside from repeating essentially the same 
phrase twice more, the report says nothing more regarding causation.  The 
Casases argue this statement is sufficient to meet the 
good-faith requirement.  We disagree.
            
An expert cannot simply opine that the breach caused the injury.  Stated so 
briefly, the report fails the second Palacios element—it does not give 
the trial court any reasonable basis for concluding that the lawsuit has 
merit.  See 46 S.W.3d at 879.  An 
expert’s conclusion that “in medical probability” one event caused another 
differs little, without an explanation tying the conclusion to the facts, from 
an ipse dixit, which we have consistently criticized.  See Pollock, 284 S.W.3d at 818 (citing Burrow, 997 
S.W.2d at 235); Earle, 998 S.W.2d at 890 (“An expert’s simple ipse 
dixit is insufficient to establish a matter; rather, the expert must explain 
the basis of his statements to link his conclusions to the 
facts.”).  Instead, the expert must go further and explain, to a 
reasonable degree, how and why the breach caused the injury based on the facts 
presented.  While we have said that no “magical words” need be used to meet 
the good-faith requirement, mere invocation of the phrase “medical probability” 
is likewise no guarantee that the report will be found adequate.  See 
Wright, 79 S.W.3d at 53.
            
Under these standards, the Casases’ report is conclusory on causation.  It offers no more than a bare 
assertion that Dr. Jelinek’s breach resulted in 
increased pain and suffering and a prolonged hospital stay.  Beyond that 
statement, the report offers no explanation of how the breach caused the 
injury.  Again, the plaintiff need not marshal all of his proof in the 
report, but he must include sufficient detail to allow the trial court to 
determine if the claim has merit.  Because the Casases’ report lacks any explanation linking the expert’s 
conclusion to the relevant facts, we hold that the trial court abused its 
discretion by denying Dr. Jelinek’s motion and the 
court of appeals erred by affirming that ruling.[9]  See id. at 52.  Accordingly, we remand the case to the trial 
court for an award of attorney’s fees and costs[10] under former article 4590i 
§ 13.01(e) against the Casases and their 
counsel.[11]
III.  
Conclusion
            
For the foregoing reasons, we reverse the court of appeals’ judgment, render 
judgment that the Casases take nothing, and remand to 
the trial court for an award of Dr. Jelinek’s 
attorney’s fees and costs consistent with this opinion.
                                                            

                                                                                    
___________________________
                                                                                    
Eva M. Guzman
                                                                                    
Justice
 
OPINION DELIVERED: December 3, 2010







[1] 
Francisco Casas and Alfredo DeLeon Jr., Casas’s husband and 
son, respectively, serve as personal representatives of her estate.  We 
refer to them collectively as “the Casases.”

[2] Columbia Rio Grande Regional Healthcare, 
L.P., d/b/a/ Rio Grande Regional Hospital.

[3] Because 
we conclude legally insufficient evidence supports the jury’s verdict, we do not 
reach the Hospital’s second issue—whether the Hospital preserved error regarding 
its proposed unavoidable accident instruction.

[4] There 
was a several-day lag between taking the culture and ordering the prescription, 
presumably to allow the culture to grow and to transmit the results to the 
treating physicians.  Thus, the Diflucan was 
prescribed on July 21 and the Vancomycin on July 
23.

[5] See 
Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 
1995 Tex. Gen. Laws 985, 986, amending the Medical Liability and 
Insurance Improvement Act of Texas, Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2041,  repealed by Act of June 2, 2003, 78th 
Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 
884.  Former article 4590i § 13.01 was replaced by Texas Civil Practice and 
Remedies Code § 74.351, as amended.    

[6] When 
asked if the lapsed prescriptions affected Casas’s 
hospital stay, Dr. Daller equivocated:
 
                
A.  I think that it certainly did impact it.  However, I cannot quantitate that because there are multiple variables that 
are present in a clinical condition.  Whether it lengthened her stay by one 
day, two days, three days, I cannot say that.  What I would say from a 
scientific standpoint is that for four and a half days she did not receive 
appropriate therapy.  Had she received the appropriate therapy then you 
would expect her length of stay to be shortened somewhat.  To quantitate that, I could not do that.
                
. . . .
                
A.  Obviously, not receiving antibiotics is not going to shorten your 
stay.  Therefore, if it impacted the stay it must have lengthened 
it. (emphases added).
 

[7] 
Admittedly, anaerobic bacteria are hard to culture because they are 
averse to oxygen.

[8] Dr. 
Berkowitz testified:
 
                
I think that there are a number of things that can cause things smelling bad 
besides just infection.  Tissue that dies doesn’t smell good.  There’s bacteria and products released by the dead tissue 
that don’t smell good.
                
And we know based on the pathology report of the cancer that they took out of 
her abdomen, that this had grown enough that it was 
dying.  In other words, it was probably outgrowing it’s [sic] blood supply and was starting to die.  That in and of itself can smell bad.  Then you have a 
wound that is infected; although Candida itself does not typically smell bad, 
not like something dead.  It smells funky and people don’t like the way it 
smells.  The wound itself when it wasn’t healing was probably having some 
necrotic tissue, as well, or dead tissue that is in the wound.  I’m sure 
that smelled bad, as well.  And they were never able to completely get rid 
of all that dead cancer tissue that was in her abdomen.
                
I think there’s a number of reasons why she would have 
had a bad smell, none of which can be explained by four or five days of not 
getting Flagyl [or] Maxipime.

[9] In his 
dissent, Chief Justice Jefferson 
argues that an expert report need not meet the legal sufficiency 
requirements necessary to support a judgment and suggests that we hold it 
must.  We agree that an expert report need not “meet the same requirements 
as the evidence offered in a summary-judgment proceeding or at trial.”  
Palacios, 46 S.W.3d at 879.  But, as we 
stated earlier, the report must provide more than conclusory statements concerning applicable standards of 
care, breach of those standards, and causation.  See id.  An 
expert report must instead, within its four corners, provide some explanation as 
to each of these elements.  Tex. 
Rev. Civ. Stat. 
art. 4590i § 13.01(r)(6); 
Wright, 79 S.W.3d at 52.  The report here offered only a conclusory statement concerning causation with no 
explanation as to how the lapse in antibiotic treatment resulted in longer 
hospitalization, increased pain and suffering, or ultimately Casas’s death.

[10] In her 
dissent, Justice Lehrmann 
indicates that (1) she would remand the case to allow the Casases an opportunity to show that their failure to present 
an adequate report was not intentional or the result of conscious indifference, 
and (2) Dr. Jelinek should not be entitled to 
attorney’s fees and costs if the Casases can make this 
showing and submit an adequate report.   We note that the Casases did not request a remand of this nature, nor brief 
the attorney’s fees issue.  See State v. Brown, 262 S.W.3d 
365, 370 (Tex. 2008) (observing that “[a] party generally is not entitled to 
relief it does not seek” and refusing to sua sponte grant relief that was not sought); Fed. 
Sign v. Tex. S. Univ., 951 S.W.2d 401, 410 (Tex. 1997) (noting that 
ordinarily, failure to brief an argument waives error on appeal); Tex. R. App. P. 38.1(h).

[11] We 
briefly note that under former article 4590i a trial court’s order denying a 
motion to dismiss premised on an inadequate expert report was not immediately 
appealable, as it now is under Texas Civil Practice and Remedies Code §§ 51.014 
and 74.351.  Nor did we definitively say that mandamus review was 
appropriate for such orders until almost four years after the trial court denied 
Dr. Jelinek’s motion for dismissal and 
sanctions.  See In re McAllen Med. Ctr., Inc., 275 S.W.3d 458, 461–62 (Tex. 2008).  Thus, we do not 
fault Dr. Jelinek for waiting until final judgment to 
seek review of the trial court’s order.  See Hernandez v. Ebrom, 289 S.W.3d 316, 318 (Tex. 2009) (“Generally, 
appeals may only be taken from final judgments . . . .”).
                
We mention this point because we have since cautioned that a defendant—having 
foregone the interlocutory appeal now available—risks losing the right to appeal 
following final judgment if, after a trial on the merits, the jury finds the 
defendant liable.  See id. at 321.  
Even if the present statute applied here, this caution would not bar Dr. Jelinek’s appeal because he was not a party at trial, having 
been nonsuited earlier.  We will not bar a nonsuited defendant’s appeal after final judgment because 
the jury finds him liable at a former codefendant’s trial.  Such a 
defendant did not call or cross-examine witnesses, present evidence, or 
otherwise participate at trial and should not be bound by what happens 
there.